Robert P. Goe - State Bar No. 137019
Charity J. Manee – State Bar No. 286481
**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
rgoe@goeforlaw.com
cmanee@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Debtor: 3200 Myers Street Partners, LLC,
                      a California limited liability company

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>3200 MYERS STREET PARTNERS, LLC,<br>a California limited liability company,<br><br>Debtor and Debtor in Possession. | Case No. 8:22-bk-10057-SC<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER:**<br>**1.  AUTHORIZING PRIVATE SALE OF REAL PROPERTY (64 HALSTEAD BLVD., ZELIENOPLE, PA 16063-1911) FREE AND CLEAR OF LIENS AND INTERESTS;**<br>**2.  APPROVING OVERBID PROCEDURES IN CONNECTION WITH THE PROPOSED SALE;**<br>**3.  APPROVING BREAKUP FEE;**<br>**4.  CONFIRMING SALE TO THE THIRD PARTY PURCHASER;**<br>**5.  DETERMINING THAT THE BUYER IS A GOOD FAITH PURCHASER; AND**<br>**6.  WAIVING THE FOURTEEN DAY STAY PRESCRIBED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h)**<br><br>**DECLARATIONS OF ROBERT MOSIER, DANA GRAU AND SAMI SOUID (FOR BUYER) IN SUPPORT THEREOF.**<br><br><u>Hearing</u><br>Date:            May 4, 2022<br>Time:            1:30 p.m.<br>Courtroom:    5C |

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND TO ALL OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE THAT** 3200 Myers Street Partners, LLC, debtor and debtor-in-possession ("Debtor") moves the Court for an order (1) authorizing the sale of real property commonly known as 64 Halstead Blvd., Zelienople PA 16063-1911 ("Property") free and clear of liens and interests, (2) approving overbid procedures in connection with the proposed sale, (3) approving breakup fee (4) confirming sale to the third party purchaser, (5) determining that the buyer is a good faith purchaser, and (6) waiving the fourteen day stay prescribed by Federal Rule of Bankruptcy Procedure 6004(h) ("Motion").

This Motion is supported by this Notice of Motion, the attached Memorandum of Points and Authorities, the Declarations of the Robert Mosier ("Mosier Declaration"), Dana Grau ("Grau Declaration") and Sami Souid ("Souid Declaration") in support thereof.

By this Motion, the Debtor seeks an order under section 363 of the Bankruptcy Code approving the sale the Property on the terms and conditions stated in the written offer set forth in the "Agreement for the Sale of Commercial Real Estate" dated March 29, 2022 ("Sale Agreement") and the Addendum to Agreement for the Sale of Commercial Real Estate of even date ("Addendum," and together with the Sale Agreement, the "Agreement") by and between the Debtor and JEMF PA 64, LLC which assigned its rights to JEM PAC, LLC ("Buyer"). A true and correct copy of the Agreement is attached to the Mosier Declaration as **Exhibit "1"**. The Agreement provides that Buyer will pay the amount of $1,425,000, subject to qualified overbids. As part of the Motion, the Debtor seeks an order approving the sale free and clear of certain liens, claims, interests (collectively, "Claims and Interests") pursuant to 11 U.S.C. § 363(f), with said Claims and Interests to attach to the sales proceeds in the same manner and priority as under applicable law.

The Property is being sold on an "as is, where is" basis with no warranties, recourse, contingencies or representations of any kind except as may be provided in the Agreement, and that the Property sold is free of the Claims and Interests. As part of the Motion, Debtor also seeks an

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

order approving and establishing bidding procedures to be implemented at the hearing on the Motion in the event a qualified overbidder is interested in purchasing the Property and approving a breakup fee in favor of Buyer in the event of a successful overbid.  Finally, Debtor seeks an order (i) confirming the sale to Buyer, or the successful qualified overbidder, (ii) authorizing the Debtor to execute any and all documents that may be necessary to consummate the sale, (iii) determining that Buyer, or the successful qualified overbidder, is entitled to the good faith protections provided under 11 U.S.C. § 363(m), and (iv) waiving the fourteen (14) day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

The proposed sale to the Buyer is subject to approval of the United States Bankruptcy Court and to qualified overbids, and any person or entity desiring to submit an overbid must qualify pursuant to the bidding procedures ("Bidding Procedures") set forth below in the Motion.

**PLEASE TAKE FURTHER NOTICE** that any response to this Motion must be filed and served no later than 14 days prior to the hearing on this Motion.  See Local Bankruptcy Rule (LBR) 9013-1(f).  Failure to timely file a response to the Motion may be deemed as your consent to the granting of the relief requested in the Motion.  See LBR 9013-1(h).

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1. Granting the Motion;

2. Authorizing and approving the sale of the Property to Buyer, or the successful qualified overbidder, pursuant to the Agreement and 11 U.S.C. § 363(f);

3. Authorizing and approving the Bidding Procedures;

4. Approving a breakup fee in the among of $25,000 in favor of Buyer;

5. Authorizing the Debtor to execute any and all documents that may be necessary to consummate the sale;

6. Determining Buyer or the successful qualified overbidder is entitled to 11 U.S.C. § 363(m) protection; and

\\\

7.  Waiving the fourteen (14) day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Dated: April 11, 2022

Respectfully submitted by,
**GOE FORSYTHE & HODGES LLP**

By:  /s/Robert P. Goe
Robert P. Goe
Charity J. Manee
Counsel for 3200 Myers Street Partners, LLC

**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

By the Motion, the Debtor[1] seeks an order approving the sale of the Property to the Buyer on the terms and conditions set forth in the Agreement.  The Agreement provides that Buyer will pay the amount of $1,425,000, subject to overbids from qualified bidders.  By the Motion, the Debtor also seeks an order approving the sale free and clear of the Claims and Interests, with any Claims and Interests attaching to the sales proceeds in the same manner and priority as under applicable law.  The Property is being sold on an "as is, where is" basis, with no warranties, recourse, contingencies, or representations of any kind, except as may be provided in the Agreement.  The Debtor also seeks an order (i) confirming the sale to Buyer, or the successful qualified overbidder, (ii) authorizing the Debtor to execute any and all documents that may be necessary to consummate the sale, (iii) determining that Buyer, or the successful qualified overbidder, is entitled to the good faith protections provided under 11 U.S.C. § 363(m), and (iv) waiving the fourteen (14) day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Debtor believes all requirements for approval of the sale under the applicable provisions of the Bankruptcy Code are satisfied and as such, requests that the Court grant the Motion.

### II.    FACTUAL BACKGROUND

1.    The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 14, 2022 (the "Petition Date").

2.    The Debtor is operating and managing its affairs as a debtor-in- possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.  No trustee or examiner has been appointed in this case.

#### A.    The Property and the Encumbrances Against It

3.    In its Schedule A/B, Debtor scheduled the Property, which consists of 5.71 acres of land on which a 93,400 square foot warehouse, distribution and/or light manufacturing building is situated.  Among the building's square footage is 3,400 square feet of office space.

---

[1] Capitalized terms not defined herein have the same meaning as they do in the Motion and Notice of Motion.

1   Debtor valued the Property at $1,300,000 in its Schedule A/B based on the highest offer for the

2   Property as of that date.

3       4.     According to the Preliminary Title Report for the Property, which is attached to

4   the Mosier Declaration as **Exhibit "2"**, there are no liens or encumbrances against the Property

5   other than the regular 2022 property tax assessment due in the amount of $2,581.85.

6       **B.**    **Employment of Brokers and Marketing of the Property**

7       5.     On February 18, 2022, the Court entered an Order approving the employment of

8   Cushman & Wakefield | Grant Street Associates, Inc. ("Broker") to sell the Property [Docket

9   No. 62].

10       6.     Pre-petition, and since February of 2021, Broker has been actively marketing the

11   Property for sale, and will continue to do so until the Auction, defined below, is conducted.  A

12   true and correct copy of the marketing flyer for the Property is attached to the Grau Declaration

13   as **Exhibit "3"**.

14       7.     The Property was under contract to be sold to a buyer pre-petition and in the latter

15   half of 2021 for $1,300,000, however, the buyer in that transaction, CE-Zeli LP, cancelled the

16   contract and has asserted an unsecured claim against the Debtor's estate related to that

17   transaction, to which the Debtor will be objecting.  CE-Zeli LP has made a post-petition offer for

18   the Property but it is less than the Buyer's offer.

19       8.     The offer reflected in the Agreement is the highest and best offer Debtor has

20   received for the Property to date.

21       **C.**    **Buyer is a Good Faith Purchaser**

22       9.     As set forth in the Souid Declaration and Mosier Declaration, Buyer has no

23   relation to the Debtor or other creditors of the estate and has acted in good faith in presenting its

24   initial offer and in negotiating the Agreement.

25   **III.**    **SUMMARY OF PROPOSED SALE**

26       The proposed sale to the Buyer includes the following salient terms:

27       1.     The Property will be sold to Buyer for the total purchase price of $1,425,000,

28   subject to overbids;

**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

2.      Buyer has provided Debtor with a non-refundable deposit of $82,000.

3.      The Property Tax Installment in the estimated amount of $2,581.85 will be paid from the sales proceeds;

4.      The Property will be sold free and clear of Claims and Interests, though none are known to the Debtor other than the Property Tax Installment.

5.      The approved fees and costs of the sale chargeable to the Debtor's bankruptcy estate, including commissions due to the Debtor's Broker[1] will be paid from the sale proceeds.

6.      Except as otherwise set forth herein, the Property shall be sold free and clear of the Claims and Interests pursuant to 11 U.S.C. 363(f), including unknown encumbrances, liens, claims or interests, with each of the Claims and Interests, if any are asserted, attaching to the net sale proceeds to be held by the Debtor in such priority, with such effect, and to secure such amounts as shall be determined in accordance with applicable federal and state law, and such proceeds shall continue to be so held by the Debtor, subject to further order of the Court.

Based on the foregoing, and the fact that Debtor does not anticipate any negative tax consequences from the sale other than payment of $6,000 on account of California's Gross Receipts Tax applicable to limited liability companies (which Debtor seeks authority to pay after closing), the Debtor anticipates the sale will provide a net benefit to the bankruptcy estate of approximately $1,328,500, calculated as follows:

| | |
|---|---|
| FMV/ Offer | $1,425,000 |
| Costs of Sale (6%) (approx.) | $85,500 |
| Property Taxes (approx.) | $5,000[2] |
| California Gross Receipts Tax | $6,000 |
| Net Amount to Estate (est.) | $1,328,500 |

---

[1] Broker has agreed to a reduced commission of 5% instead of the contractual 6%. Buyer has no broker. An additional 1% was added for other estimated closing costs.

[2] The amount of any liens to be paid through escrow is an estimate. If there is a dispute with respect to the amount of any lien, the Debtor will pay the undisputed portion of the claim and segregate the disputed portion pending further order of the Court. Nothing herein is meant to deprive the Debtor or any party with standing from investigating and challenging the nature, amount, and extent of any lien or claim to be paid through escrow. Nothing herein should be deemed a waiver, release, or admission of any fact claim, claim or defense, each of which are expressly reserved to the Debtor.

## IV. **PROPOSED BIDDING PROCEDURES**

The Debtor's proposed Bidding Procedures are as follows:

### A. **Continued Marketing and Access to Information**

Between the date of this Motion and the hearing on the sale ("Sale Hearing"), the Debtor will continue to solicit interest in the Property and provide information to prospective bidders ("Potential Bidders") as well as Buyer. In order to participate in the process, a Potential Bidder will be provided with reasonable access to the Property, as well as to due diligence materials available to Debtor. Debtor and its professionals will also be available to answer any questions regarding the information in the due diligence materials or any other reasonably requested information.

### B. **Bidding Process**

The Debtor, with the assistance of its professionals, shall use commercially reasonable good faith efforts to: (i) determine whether any entity or person is a Potential Bidder and Qualified Bidder (as defined below); (ii) receive bids from any Qualified Bidders; and (iii) if Qualified Bids (as defined below) are timely received, conduct an auction ("Auction") between Buyer and other Qualified Bidders at the Sale Hearing to determine the Successful Bid (as defined below) in accordance with these Bidding Procedures (collectively, the "Bidding Process").

Any entity or person who wishes to participate in the Bidding Process must be a Qualified Bidder. The Debtor shall not be obligated to furnish information of any kind regarding the Property to any entity or person that is not a Potential Bidder (as defined below). The Debtor shall have the right to adopt such other rules for the Bidding Process that are not materially inconsistent with any of the provisions of the Agreement, the Bidding Procedures, or any Bankruptcy Court order that, in the Debtor's sole judgment, promotes a fair, open, and competitive Bidding Process. Any such adoption shall be stated on the record of the Auction at the Sale Hearing.

### C. **Qualified Bidders and Participation Requirements**

Unless otherwise ordered by the Bankruptcy Court for cause shown or in the Debtor's good faith business judgment, to participate in the Bidding Process each interested entity or person (each, a "Potential Bidder") must deliver to the Debtor the most current audited and latest

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

unaudited financial statements (collectively, the "Financials") of such interested entity or person, or such other evidence reasonably acceptable to the Debtor, that evidence such interested entity's or person's financial capability to fully and timely consummate a transaction on the terms of its bid were such bid to be accepted by the Debtor and approved by the Bankruptcy Court.

The Debtor shall provide Potential Bidders with a copy of the Agreement. A "Qualified Bidder" is a Potential Bidder that submits to the Debtor a Qualified Bid by no later than one (5) business days prior to the Auction. A "Qualified Bid" is a "Marked Agreement", dated and signed by the Potential Bidder, on the terms of the Agreement, subject to minor changes which individually or together would not, in the reasonable judgment of the Debtor, be materially more favorable to the "buyer" under the Marked Agreement than the Agreement is to Buyer, and also subject to the following requirements (each, a "Qualified Bid"):

(i)  the purchase price would be paid in cash at closing in an amount not less than $1,475,000;

(ii)  the Marked Agreement would be accompanied by a cash deposit of at least 10% of the Qualified Bid, which would be immediately nonrefundable if the Qualified Bidder were to become the Successful Bidder (the "Good Faith Deposit") and was unable to close escrow for any reason other than material breach by the Debtor;

(iii)  there would be no "Feasibility Period" and the closing would occur on the date required under the Agreement;

(iv)  the Qualified Bidder would not be entitled to any reports, studies, or other due diligence generated from Buyer's investigation of the Property;

(v)  it would not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence; it would be irrevocable through the conclusion of the Auction;

(vi)  it would not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment;

(vii)  it would acknowledge and represent that the bidder (a) tendered its bid with full knowledge it conducted, or had the opportunity to conduct, its due diligence with respect to the

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

Property, or otherwise to inspect and examine the Property and the transaction structure set forth in the Agreement prior to the Sale Hearing, (b) in making its bid, it has relied solely on its own independent review and investigation of same, and (c) it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, or by operation of law or otherwise regarding same, or the completeness of any information provided in connection therewith at the Auction, except as expressly stated in the Marked Agreement or the Bidding Procedures; and

(viii)    it fully discloses the identity of each person or entity that will be bidding or otherwise participating in connection with such bidding, and all terms of any such participation that, in the reasonable business judgment of the Debtor, are relevant to such bid.  A bid received from a Qualified Bidder before the Bid Deadline (as defined below) that meets the above requirements shall constitute a "Qualified Bid" provided, however, that the Debtor may request that a Qualified Bidder amend its bid to address any failure to comply with any of the requirements listed in this paragraph.  For purposes of the Bidding Process, the Agreement executed by Buyer constitutes a Qualified Bid and Buyer is deemed a Qualified Bidder.  Each Qualified Bidder must disclose all of its pre-petition and post-petition relationships with other bidders, the Debtor, or creditors of the Debtor.  Only a Qualified Bidder is entitled to bid at the Auction.  Each Potential Bidder, whether a Qualified Bidder or not, and its affiliates or joint venturers, shall be deemed to have submitted to the exclusive jurisdiction of the Bankruptcy Court with respect to all matters relating to its bid, the Auction and the purchase/sale of the Property.

**D.    Bid Deadline**

A Potential Bidder that desires to make a bid shall deliver by mail or hand delivery a signed and dated Marked Agreement and Good Faith Deposit so that both are received by the Debtor by not later than 5:00 p.m. (PST), three (3) business days prior to the Sale Hearing (the "Bid Deadline"), addressed as follows:  Robert P. Goe, Goe Forsythe & Hodges LLP,  18101 Von Karman Ave., Ste 1200, Irvine, CA 92612  (email: rgoe@goeforlaw.com ; fax (949) 955-9437). Only Potential Bidders that become Qualified Bidders by timely submitting a Qualified Bid prior to the Bid Deadline (as it may be extended in compliance with these Bidding Procedures) shall be

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

entitled to bid at the Auction.  The Debtor may extend the Bid Deadline once or successively, but is not obligated to do so.  If the Debtor extends the Bid Deadline, it shall promptly notify all Potential Bidders of the extension.

### E.    Auction

If any Qualified Bid (other than that of Buyer under the Agreement) is received by the Bid Deadline, then the Debtor shall conduct the Auction at the Sale Hearing for the right to become the Successful Bidder.  If no Qualified Bid, other than that of Buyer under the Agreement, is received by the Bid Deadline, then the Debtor will not conduct the Auction and shall designate Buyer's bid as the Successful Bid for the purposes of these Bidding Procedures.

Prior to the Auction, the Debtor shall (i) notify all Qualified Bidders, including Buyer, of the Qualified Bid that, in the Debtor's sole discretion, constitutes the highest or otherwise best Qualified Bid (the "Initial Overbid"), and (ii) deliver to Qualified Bidders, including Buyer, a copy of each Qualified Bid that it has received.

The Auction shall commence at the Sale Hearing and shall take place in Courtroom "5C" of the United States Bankruptcy Court, Central District of California, Santa Ana Division, located at 411 West Fourth Street, Santa Ana, California 92701, or such other time or place as the Debtor and/or the Court may direct in writing to all Qualified Bidders.

The Auction shall be conducted in accordance with the following procedures: (i) only the Debtor, the Buyer, and other Qualified Bidders (and their advisors) who have timely submitted Qualified Bids will be permitted to attend and participate in the Auction, (ii) only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate in the Auction, (iii) all Qualified Bidders must be present at the Auction Hearing or be represented by a qualified representative, (iv) unless specified by the Debtor, no Qualified Bidder will be permitted more than ten (10) minutes to respond to the previous bid, and (v) any Qualified Bidder who is absent from the Auction for more than ten (10) consecutive minutes while the Auction is in progress is presumed to have affirmatively withdrawn from the Auction.

At the Auction, Qualified Bidders will be permitted to increase their bids.  The bidding shall start at the amount of the Initial Overbid.  The Debtor or its counsel shall announce prior to

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

each subsequent round of bidding the minimum incremental overbid, which for the initial incremental overbid shall be $50,000, and for each subsequent incremental overbid shall be an amount that is not less than $1,000. All bids at the Auction shall be made on the record.

The Debtor, in consultation with its Broker and legal advisors, shall review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the transaction process and the best interests of the Debtor's estate, including those factors affecting the speed and certainty of consummating the transaction, and immediately prior to the conclusion of the Auction (i) identify the Successful Bid, (ii) identify the next highest or otherwise best offer after the Successful Bid (the "Next Highest Bid"), and (iii) notify all Qualified Bidders present at the Auction of the identities of the bidder that submitted the Successful Bid (the "Successful Bidder") and the bidder that submitted the Next Highest Bid (the "Next Highest Bidder"), and the respective amounts and terms of their bids. At the Sale Hearing, the Debtor shall present the Successful Bid to the Bankruptcy Court for approval.

If the bidder identified by the Debtor as the Next Highest Bidder agrees to maintain its status as a back-up bidder, then it also must agree that its Next Highest Bid will remain irrevocable and subject to acceptance by the Debtor, and the Debtor will retain its Good Faith Deposit, until the earlier of (i) the closing and effectiveness of the transaction contemplated in the Successful Bid, or (ii) five (5) business days following the termination of the Agreement or Marked Agreement, as applicable, evidencing the Successful Bid. If the bidder initially identified by the Debtor as the Next Highest Bidder does not agree to such terms, then the Debtor, in its sole discretion, may identify the next highest or otherwise best bid as the Next Highest Bid, and may continue to do so until such a bidder who has submitted such a bid agrees to become the Next Highest Bidder.

F.     **Acceptance of Successful Bid**

In the event that an Auction is held, the Debtor intends to enter into the transaction contemplated by the Agreement or Marked Agreement, as applicable, with the Successful Bidder, whether such purchaser is Buyer or another Qualified Bidder. However, the Debtor's acceptance at the Auction of a Successful Bid by a bidder other than Buyer shall not be deemed a termination

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

of the Agreement and shall not require the Debtor to return the Good Faith Deposit of Buyer if Buyer agrees to become the Next Highest Bidder.

The Debtor and the Successful Bidder shall close the transactions contemplated by the Agreement (or Marked Agreement) in accordance with the Agreement (or Marked Agreement).  In the event the Successful Bidder fails to close the transaction contemplated in the Agreement (or the applicable Marked Agreement), the Debtor shall be authorized, but not required, to close with the Next Highest Bidder without notice to any other party or further court order.  If the Debtor decides to close with the Next Highest Bidder, the Debtor and the Next Highest Bidder shall have an additional ten (10) calendar days to close, subject to extensions by the Court for cause shown.

### G.    Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held by the Debtor or, with respect to that of Buyer, in a manner consistent with the Agreement and the Bidding Procedures but shall not become property of the Debtor's estate absent further order of the Bankruptcy Court or pursuant to the terms and conditions of the Agreement (or the applicable Marked Agreement) or the Bidding Procedures.  Subject to the terms and conditions of the Agreement or Marked Agreement, as the case may be, the Good Faith Deposits made by Qualified Bidders, other than those made by the Successful Bidder and any Next Highest Bidder who agrees to maintain its status as a back-up bidder, together with any and all interest that may have accrued thereon, shall be returned to such Qualified Bidder within ten (10) business days following the conclusion of the Auction.  If the Successful Bidder (or a Next Highest Bidder who agrees to maintain its status as a back-up bidder) timely closes by the closing date set forth in the Agreement or, if applicable, a Marked Agreement, then its Good Faith Deposit shall be credited towards the amount due at closing under the Agreement or such Marked Agreement.  If the Successful Bidder, or a Next Highest Bidder who agrees to maintain its status as a back-up bidder, fails to timely close by the closing date set forth in the Agreement or, if applicable, a Marked Agreement, then its Good Faith Deposit shall be disposed of as provided in the Agreement (or the applicable Marked Agreement) or the Bidding Procedures.

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

**H.    Breakup Fee**

In the event that a Qualified Bidder other than the Buyer is the Successful Bidder for the Property at Auction, the Buyer shall be entitled to receive a breakup fee in the amount of $25,000 (the "Breakup Fee"), paid directly to the Buyer at closing from the proceeds of the sale to the Successful Bidder.

**I.    Modification**

The Debtor may extend or alter any deadline contained in the Bidding Procedures if it will better promote the goals of the Bidding Process provided such alterations and deadlines do not result in a timeline that extends beyond the timelines provided for in the Agreement without Buyer's express written consent.  At or before the Sale Hearing, the Bankruptcy Court or the Debtor may impose such other terms and conditions as they may determine to be in the best interests of the Debtor's Estate, creditors, and other parties in interest.

**V.    THE PROPOSED BIDDING PROCEDURES SHOULD BE APPROVED.**

A trustee (or debtor in possession) may sell property of the estate other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1).  "A bankruptcy court can authorize the sale of substantially all of the assets of the estate under § 363(b) upon a proper showing that the sale is in the best interests of the estate, that there is a sound business purpose for the sale, and that it was proposed in good faith."  *In re Kellogg-Taxe*, 2014 Bankr. LEXIS 1033, at *17 (Bankr. C.D. Cal. Mar. 17, 2014) (citing *In re 240 N. Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *In re Lionel*, 722 F.2d 1063, 1070 (2d Cir. 1983).

Courts recognize that "[c]ompetitive bidding yields higher offers and thus benefits the estate.  Therefore, the objective is 'to maximize bidding, not restrict it.'" *See In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  In connection with a proposed sale of property, overbid procedures are designed to ensure that a bankruptcy estate receives the maximum amount possible for the benefit of creditors.  However, the estate is not compelled to entertain every offer submitted.  "A debtor may avoid the increased cost and complexity associated with considering additional bids unless the additional bids are high enough

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

1   to justify their pursuit." *In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992).  In *Wintex,* the

2   court held that a ten percent (10%) increase requirement constituted a "reasonable litmus test." *Id.*,

3   at 543.  Court approval for bidding procedures is appropriate to organize the process for seeking

4   and considering bids for a sale pursuant to Section 363.  *In re WCI Cable, Inc.*, 282 B.R. 457

5   (Bankr. D. Or. 2002).  In *In re Onouli Kona Land Co.*, 846 F.2d 1170 (9th Cir. 1988), the Ninth

6   Circuit upheld the validity of the notice of the auction of the debtor's asset, a large parcel of real

7   estate, even though there was only one bidder, the major secured creditor, where the "the period

8   before the auction, the sale commissioner published advertisements once a week for three weeks,

9   issued over 300 fact sheets to possible bidders, and gave Debtor an opportunity to advertise

10  independently."  *Id.*, at 1174. *See also In re Alves*, 52 B.R. 353, 355 (Bankr. D. R.I. 1985)

11  (approving auction sale where property was given adequate marketing exposure).

12          Additionally, courts have long recognized the need for competitive bidding at hearings on

13  private sales as "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore,

14  the objective is 'to maximize bidding, not restrict it'".  *In re Atlanta Packaging Products, Inc.*, 99

15  B.R. 124, 131 (Bankr. N.D. Ga. 1988) (citation omitted).  A corollary to these principles is that the

16  court should not "cherry-pick" among contractual provisions, objecting to select individual

17  portions, if the agreement as a whole is supported by an articulated business judgment.  At least

18  one bankruptcy court has expressly applied this corollary to a transaction including breakup and

19  overbid provisions in the sale of the debtor's business.  In *In re Crowthers McCall Pattern, Inc.*,

20  114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions

21  relating to a breakup fee and a requirement that overbids be at least $500,000.  In responding to

22  objections to other provisions of the agreement, the court held that:

23          The Court is not to second guess the inclusion of some provisions as long as the
        Agreement as a whole is within reasonable business judgment, and the subject provisions
24      do not distort the balance Congress struck in Chapter 11. Cf. *In re Ames Dep't Stores, Inc.,
        Eastern Retailers Service Corp., et al.*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some
25      contractual provisions may be justified by the need to attract a prospective investor).

26  *Id.*, at 888.

27          In this case, the Debtor submits that the proposed Bidding Procedures are reasonable,

28  appropriate, and satisfy the business judgment rule.  The Bidding Procedures are proposed in good

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

faith and the Debtor believes the requested procedures will result in a maximized price for the Property.  Further, the Debtor submits that the minimum initial overbid of at least $50,000 (for a total initial overbid of at least $1,475,000 against an Initial Bid of $1,425,000 is justified by the facts of this case.  Indeed, the Initial Overbid increment is far less than the ten percent deemed appropriate in *Wintex* and is a reasonable increase requirement.  The minimum bid was selected by the Debtor, after consulting with its Broker and counsel, to compensate the estate for the expenses associated with seeking approval of the bidding procedures and the sale.  The initial overbid will guard against the loss of money by accepting a higher bid and will not chill the bidding process.  Finally, the Debtor submits that subsequent incremental bids of $1,000, when compared against the Initial Bid, are also reasonable and designed to encourage bidding, yet at the same time avoid the unnecessary delay that would come with unduly small incremental bid amounts.  Under these circumstances, the Bidding Procedures and timetable established for the sale of the Property are more than reasonable and will ensure competitive bidding.

## VI.  THE BREAKUP FEE IS REASONABLE AND SHOULD BE APPROVED.

Breakup fees such as the fee being proposed here ($25,000) ("Breakup Fee") have been approved by numerous other courts.  The Debtor believes that the Breakup Fee is necessary to attract to highest and best stalking horse bid, which is the price offered by the Buyer.

Within the bankruptcy context, courts have reviewed such fees under different standards.  Some courts carefully scrutinize such agreements and refuse to defer to the trustee's business judgment. *See e.g., In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994).  However, "the better and more widely held view is that agreeing to [break-up] fees can be an appropriate exercise of the trustee's business judgment." 3 Collier on Bankruptcy P 363.02 (16th 2022) (citing *In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y.1992)). Collier reasons as follows:

> In a negotiated section 363(b) sale, as in a nonbankruptcy sale of assets, buyer protections may be necessary to maximize the price obtained. Moreover, the fee will not be payable unless the trustee receives a higher price, which should more than cover the amount of the fee, so that the estate is not incurring an expense for which it receives no value. Consequently, although a court should review the trustee's agreement to provide bidding protections, courts should approve such an agreement where it is the product of a sound exercise of the trustee's business judgment and seems to enhance the bidding process or benefit the estate directly, even in a sale under a plan. The court should withhold approval

> only if the amount is unreasonable or appears more likely to chill the bidding process than
> to enhance. For example, a requirement of a disproportionate bid increment would be
> more likely to chill bidding, while a breakup fee that was reasonably calculated to
> compensate the bidder for its time and expense would not likely chill bidding.

*Id.* (citing *Integrated Resources*, 147 B.R. 650; *In re Tama Beef Packing, Inc.*; 290 B.R. 90 (BAP 8th Cir. 2003)*; In re Women First Healthcare, Inc.*, 332 B.R. 115 (Bankr. D. Del. 2005)).

The Local Bankruptcy Rules appear to concur with this deferential sentiment towards the trustee/debtor in possession's business judgment. Pursuant to LBR 6004-1(b)(6), a sale procedure motion that requests a break-up fee or other form of overbid protection must support the request with evidence establishing: "(A) [t]hat such a fee is likely to enhance the ultimate sale price; and (B) [t]he reasonableness of the fee." *See* LBR 6004-1(b)(6).

Regarding the enhancement of the ultimate sale price, "[c]ourts have recognized that break-up fees can serve three possible useful functions to enhance the ultimate sale price: "(1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Integrated Resources*, 147 B.R. at 662. Here, the Debtor believes that the Breakup Fee is necessary to attract the bid from Buyer, which is the highest and otherwise best bid for the Property that the Debtor has received to date and which may likely be the successful bid for the Property at the Auction. In addition to being a very strong offer, the Buyer's bid will also set a floor to bidding for other potential bidders to offer overbids and should encourage further bidding from other parties as it "legitimizes" the sale by expressing Buyer's satisfaction with the results of its due diligence.

Regarding the reasonableness of a break-up fee, "[c]ourts have adopted as a rule of thumb a limitation on a breakup or topping fee of about 3 percent of the consideration the buyer will pay for the assets, including assumption of liabilities, although courts have approved higher amounts, up to about 5 percent of the consideration in unusual circumstances." 3 Collier on Bankruptcy ¶ P 363.02 (16th 2022). Here, the Breakup Fee, which is approximately 1.7% of the purchase price, is well within courts' rule of thumb, and is intended to (1) incentivize the Buyer to lock itself into the Agreement, and (2) compensate the Buyer for "legitimizing" the Auction by expressing satisfaction with the results of its due diligence, which the Debtor believes will encourage overbidding from other Qualified Bidders.

# VII.    THE SALE IS IN THE BEST INTERESTS OF THE ESTATE AND SHOULD BE APPROVED.

Section 363(b) of the Bankruptcy Code provides that after a notice and a hearing, a trustee or debtor in possession may sell property of the estate outside the ordinary course of business.  11 U.S.C. §§ 363(b), 1107(a). "The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers." *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani),* 325 B.R. 282, 288-289 (B.A.P. 9th Cir. 2005).

In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test. 3-363 *Collier on Bankruptcy* ¶ 363.02[4].  "Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection."  *In re Lahijani*, 325 B.R. at 289.  The bankruptcy court reviews the trustee's business judgment only "to determine independently whether the judgment is a reasonable one.  The court should not substitute its judgment for the trustee's but should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms." 3-363 *Collier on Bankruptcy* ¶ 363.02[4].  *See In re Wilde Horse Enterprises, Inc*., 136 B.R. 830 (Bankr. C.D. Cal. 1991) (in determining whether a proposed sale of equipment was proper under Section 363, court considered whether the terms of proposed sale were fair and equitable, whether there was a good business reason for completing the sale and whether the transaction was proposed in good faith); *see also Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335-356 (Bankr. D. Del. 1987).  Additional factors a court should consider in deciding whether to approve a sale of property under Section 363 include the integrity of the sale and the preservation of the best interests of the estate.  *See In re Alves*, 52 B.R. 353 (Bankr. D. R.I. 1985); see also *In re Investors Funding Corporation of New York*, 592 F.2d 134, 135 (2d Cir. 1979) cert. denied 444 U.S. 830 (1979) (a sale of an estate's interest in real or personal property generally is allowed under Section 363 if the estate has equity in the property and the sale is in the best

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

interest of the estate).

## A.    A Sound Business Justification Exists for the Sale, Subject to Overbids

The Debtor has a sound business justification for the proposed sale of the Property to Buyer, subject to qualified overbids.  The Property has been listed for sale since 2021 and Buyer's offer is the best and highest Debtor has received to date.  Based on the Buyer's offer, the sale of the Property will enable the Debtor to satisfy claims against the estate.  Without a sale of the Property, costs associated with the retention of the Property, such as taxes and insurance, will continue to accrue.  As a result, the sale of the Property is justified since it will generate significant funds for the Debtor's estate and the price to be paid is fair and reasonable, as discussed below.

## B.    Debtor Has Given Adequate Notice of Proposed Sale

The Debtor has provided adequate notice of the proposed sale of the estate's interest in the Property.  The Debtor has caused the Motion, the Agreement, and the notice to be served on the Buyer, all creditors, parties in interest, parties on Debtor's master service list, and all persons required to receive notice pursuant to Bankruptcy Rules 6004(a), 6004(c), and 9014, with sufficient notice to allow any party in interest to object to the proposed sale.

## C.    The Sale Price is Fair and Reasonable

Based on the Debtor's analysis of the Property and the fact that the Initial Bid is the highest offer for the Property received to date, the Debtor believes that the sale price to be paid by Buyer, subject to overbids, represents a fair and reasonable price for the estate's interest in the Property.  Therefore, the Debtor is confident that the price being paid by Buyer is the highest and best price it can obtain for the estate's interest in the Property at this time, subject to any qualified overbidders who may wish to submit a Qualified Overbid.

## D.    The Sale Was Negotiated in Good Faith

The Agreement is the product of good faith, arms' length negotiations between the Debtor and Buyer.  Buyer has represented that it is not related to the Debtor, it has no prior relationship with the Debtor, and has no relationship to any creditor of the Estate.  Moreover, Buyer is not an insider of the Debtor as that term is defined by 11 U.S.C. § 101(31).  *See* the Souid Declaration

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

and Mosier Declaration attached hereto.  Further, as discussed above, the price offered by Buyer

represents a fair market price for the Property.

As such, the Debtor satisfies each of the elements governing the proposed sale of the

Property and has articulated sound business reasons for entering into and seeking consummation

of the sale.  *See* Mosier Declaration, attached hereto.  Therefore, the Debtor urges the Court to

approve the sale.

## VIII.    THE SALE SHOULD BE APPROVED FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS PURSUANT TO 11 U.S.C. § 363(F).

Section 363(f) provides that a trustee or debtor in possession may sell assets of the estate

free and clear of any interest in such property of an entity other than the estate only if: (1)

applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2)

such entity consents; (3) such interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on such property; (4) such interest is in bona fide

dispute; or (5) such entity could be compelled, in legal or equitable proceedings, to accept a

money satisfaction of such interest.  The provisions of section 363(f) operate in the disjunctive.

Thus, a debtor in possession need only demonstrate that one of the elements of this section exists.

*In re Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988).  In this case, the only encumbrance against

the Property is the Property Tax Installment, which Debtor intends to pay from the sales proceeds,

which are more than sufficient to cover such debt, thereby satisfying Section 363(f)(3).

### A.    Absent Objection, Any Alleged Lienholders Will Be Deemed to Consent to the Sale Free and Clear of Their Liens.

Debtor intends to notify all known interested parties of the sale through the notice of

motion.  Any party claiming such lien or interest against the Property may file an objection with

the Court and be heard at the hearing on the Motion.  If there are no objections by alleged

lienholders given notice of the sale, the parties will be deemed to have consented to the sale of the

Property.  *See In re Borders Group, Inc*., 453 B.R. 477 (Bankr. S.D.N.Y. 2011) ("[u]nder section

363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time

period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

of liens"); *Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale, coupled with agreement authorizing sale free of interest, constituted consent); *Elliot, supra* (implied consent found); *In re Tabore, Inc.*, 175 B.R. 855 (Bankr. D. N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of Section 363); *In re Shary*, 152 B.R. 724 (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license constituted consent to sale). Thus, pursuant to Section 363(f)(2), the Debtor may sell the Property free and clear of any interest of entities other than the bankruptcy estate because the noticed parties will be deemed to have consented to the sale of the Property if they make no objections to the sale. If an objection is filed by a known or unknown party, the Debtor believes that this will constitute a dispute within the meaning of Section 363(f)(4).

## IX.    THE SALE IS PROPOSED IN GOOD FAITH

Section 363(m) of the Bankruptcy Code authorizes the Court to make a finding that a buyer is a good faith purchaser. When granted Section 363(m) protection, a good faith purchaser of property is protected from the effects of reversal of the order authorizing a sale provided the trial court finds that the purchaser acted in good faith and the aggrieved party fails to obtain a stay of the sale order. Section 363(m) gives purchasers of a debtor's assets the "assurance of finality" with respect to "who has rights to estate property." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997); *Future Source LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002) (a bankruptcy sale order may be collaterally attacked only "within the tight limits" of Federal Rule of Civil Procedure 60(b)). In essence, sales of estate property under Section 363(b) and (c) are insulated from appeals by the safe harbor provision of Section 363(m). *In re Filtercorp, Inc.*, 163 F.3d 570, 576 (9th Cir. 1998); *In re Ewell*, 958 F.2d 276, 280 (9th Cir. 1992); *In re PW, LLC*, 391 B.R. 25, 35 (B.A.P. 9th Cir. 2008).

Although the Bankruptcy Code does not define the term "good faith", courts have provided guidance as to the appropriate factors to consider. In essence, the purpose of Section 363(m) is to disable courts from backtracking on promises with respect to bankruptcy sales in the absence of bad faith. *Kham and Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1355 (7th Cir. 1990). Generally, the requirement that a purchaser act in good faith speaks to the integrity of his conduct

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

1  in connection with the sale proceeding and focuses primarily on the disclosure of all material sale

2  terms and the absence of fraud or collusion.  *See In re Pine Coast Enterprise, Ltd.*, 147 B.R. 30,

3  33 (Bankr. N.D. Ill. 1992); *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143, 147 (3d Cir.

4  1986).  According to the Bankruptcy Appellate Panel, a "good faith purchaser" is one who buys

5  "in good faith" and "for value."  *In re M Capital Corp*., 290 B.R. 743, 746 (B.A.P. 9th Cir. 2003).

6  "Typically, lack of good faith is shown by fraud, collusion between the purchaser and other

7  bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Ewell*, 958

8  F.2d at 279.  The burden of proof to show "good faith" is on the proponent of good faith or, in this

9  case, the Debtor.  *M Capital Corp*., 290 B.R. at 747.  Here, the Debtor believes that Buyer has no

10  relation to the Debtor or other creditors of the estate, and acted in good faith in presenting its

11  initial offer and in negotiating the Agreement.  S*ee* Amrine and Kamell Declarations, attached

12  hereto.  Since there are no facts indicating bad faith, collusion, or calling into question the

13  propriety of the sale, the Court should extend Section 363(m) protection to Buyer, or any similarly

14  situated overbidder.  *See M Capital Corp.*, 290 B.R. at 747 (court may not make a finding of good

15  faith in the absence of evidence, but may make such a finding if appropriate evidence is

16  presented).

17  ## X.   THE COURT SHOULD WAIVE THE FOURTEEN DAY STAY PRESCRIBED BY

18  ## RULE 6004(H) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

19           Under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, an order authorizing

20  the sale of property, other than cash collateral, is stayed until expiration of fourteen (14) days after

21  the entry of the order, unless the court orders otherwise.  In this case, the Debtor believes there is

22  cause to waive the fourteen-day stay prescribed by Rule 6004(h) since a waiver of the fourteen-

23  day stay period will expedite the consummation of the sale.

24           **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

25       1.  Granting the Motion;

26       2.  Authorizing and approving the sale of the Property to Buyer, or the successful qualified

27           overbidder, pursuant to the Agreement and 11 U.S.C. § 363(f);

28       3.  Authorizing and approving the Bidding Procedures;

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

4. Approving the Breakup Fee in the event that a Qualified Bidder other than the Buyer is the Successful Bidder;

5. Authorizing the Debtor to execute any and all documents that may be necessary to consummate the sale;

6. Determining Buyer or the successful qualified overbidder is entitled to 11 U.S.C. § 363(m) protection; and

7. Waiving the fourteen (14) day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Respectfully submitted,

Dated: April 11, 2022                          **GOE FORSYTHE & HODGES LLP**

/s/Robert P. Goe
By:  Robert P. Goe
       Charity J. Manee
       Attorneys for Debtor
       3200 Myers Street Partners, LLC

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

### DECLARATION OF ROBERT MOSIER

I, Robert Mosier, declare and state,

I am the Chief Restructuring Officer of 3200 Myers Street Partners, LLC, the debtor and debtor in possession in this bankruptcy proceeding ("Debtor"). I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto. I make this declaration in support of Debtor's *Motion for Order: (1) Authorizing Private Sale of Real Property (64 Halstead Blvd., Zelienople, Pa 16063-1911) Free and Clear of Liens and Interests; (2) Approving Overbid Procedures In Connection With the Proposed Sale; (3) Approving Breakup Fee; (4) Confirming Sale to the Third Party Purchaser; (5) Determining That the Buyer Is a Good Faith Purchaser; and (6) Waiving the Fourteen Day Stay Prescribed By Federal Rule of Bankruptcy Procedure 6004(h)* ("Motion") to which this declaration is attached. Defined terms used herein have the same meaning as they do in the Motion.

1.      The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 14, 2022 (the "Petition Date").

2.      The Debtor is operating and managing its affairs as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee or examiner has been appointed in this case.

3.      In its Schedule A/B, Debtor scheduled the Property, which consists of 5.71 acres of land on which a 93,400 square foot warehouse, distribution and/or light manufacturing building is situated. Among the building's square footage is 3,400 square feet of office space. Debtor valued the Property at $1,300,000 in its Schedule A/B based on the highest offer for the Property as of that date.

4.      By the Motion, Debtor seeks an order under section 363 of the Bankruptcy Code approving the sale the Property to Buyer for $1,425,000, subject to overbid, pursuant to the terms and conditions set forth in the Agreement. A true and correct copy of the fully executed Agreement with Buyer is attached hereto as **Exhibit "1"** and is incorporated herein.

5.      According to the Preliminary Title Report for the Property dated March 4, 2022, which Debtor obtained with the assistance of its Broker, a true and correct copy of which is

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

1   attached to as **Exhibit "2"** and is incorporated herein, there are no liens or encumbrances against

2   the Property other than the regular property tax assessment due in the amount of $2,581.85.

3      6.    The offer reflected in the Agreement is the highest and best offer Debtor has

4   received for the Property to date.

5      7.    To the best of my knowledge, understanding, and after a diligent inquiry, Buyer has

6   no relation to the Debtor or other creditors of the estate and has acted in good faith in presenting

7   its initial offer and in negotiating the Agreement.

8      I declare, under the penalty of perjury under the laws of the United States of America, that

9   the foregoing is true and correct to the best of my knowledge and understanding.

10     Executed this ____ day of April, 2022, in Orange County, California.

11

12

13   Robert Mosier

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

### DECLARATION OF DANA SCHATZEL GRAU

I, Dana Schatzel Grau, hereby declare and state:

I am an individual over the age of eighteen (18).  I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto.  I make this declaration in support of Debtor's *Motion for Order: (1) Authorizing Private Sale of Real Property (64 Halstead Blvd., Zelienople, Pa 16063-1911) Free and Clear of Liens and Interests; (2) Approving Overbid Procedures In Connection With the Proposed Sale; (3) Approving Breakup Fee; (4) Confirming Sale to the Third Party Purchaser; (5) Determining That the Buyer Is a Good Faith Purchaser; and (6) Waiving the Fourteen Day Stay Prescribed By Federal Rule of Bankruptcy Procedure 6004(h)* ("Motion") to which this declaration is attached.  Defined terms used herein have the same meaning as they do in the Motion.

1.      I am a real estate agent with Cushman & Wakefield | Grant Street Associations, Inc. ("Broker"), a real licensed real estate broker in the State of Pennsylvania.

2.      On February 18, 2022, the Court entered an Order approving the employment of Broker to sell the Property [Docket No. 62].  I have been the listing agent for the Property since it was listed by the Debtor in 2021.

3.      Pre-petition, and since February of 2021, Broker has been actively marketing the Property for sale, and will continue to do so until the Auction is conducted.  A true and correct copy of the marketing flyer for the Property is attached hereto as **Exhibit "3"** and is incorporated herein.

4.      The Property was under contract to be sold to pre-petition, in the latter half of 2021, for $1,300,000.  However, the buyer in that transaction, CE-Zeli LP, cancelled the contract and has asserted an unsecured claim against the Debtor's estate related to that transaction.  CE-Zeli LP has made a post-petition offer for the Property but it is less than the Buyer's offer.

\\\

5.      The offer reflected in the Agreement is the highest and best offer Debtor has received for the Property to date.

I declare, under the penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge and understanding.

Executed this 9 day of April, 2022, in Pennsylvania.

*Dana Grau*
_____
Dana Schatzel Grau

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

**DECLARATION OF SAMI SOUID**

I, Sami Souid, declare and state,

I am an individual over the age of eighteen (18).  I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto.  I make this declaration in support of Debtor's *Motion for Order: (1) Authorizing Private Sale of Real Property (64 Halstead Blvd., Zelienople, Pa 16063-1911) Free and Clear of Liens and Interests; (2) Approving Overbid Procedures In Connection With the Proposed Sale; (3) Approving Breakup Fee; (4) Confirming Sale to the Third Party Purchaser; (5) Determining That the Buyer Is a Good Faith Purchaser; and (6) Waiving the Fourteen Day Stay Prescribed By Federal Rule of Bankruptcy Procedure 6004(h)* ("Motion") to which this declaration is attached. Defined terms used herein have the same meaning as they do in the Motion.

1.      I am the principal and managing partner of JEM PAC, LLC, the Buyer of the Property pursuant to the Agreement.

2.      To the best of my knowledge, Buyer does not have any relation to the Debtor, the Debtor's creditors, or any judge of the United States Bankruptcy Court for the Central District of California, the United States Trustee, or any person currently employed in the Office of the United States Trustee.

3.      The purchase price and Agreement are the product of an arms-length negotiation with the Debtor and its agents and representatives.

I declare, under the penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge and understanding.

Executed this __ day of April, 2022, in New York, New York.



_____
Sami Souid

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

# EXHIBIT 1

EXHIBIT 1

**Pennsylvania Association of Realtors®**

# AGREEMENT FOR THE SALE OF COMMERCIAL REAL ESTATE    ASC

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

| PARTIES |
|---|

| BUYER(S): JEMF PA 64, LLC. | SELLER(S): 3200 Myers Street Partners, LLC. |
|---|---|
| | c/o Robert Moiser |
| 911 Avenue U | 3151 Airway Avenue Ste. A-1 |
| Brooklyn, NY 11223 | Costa Mesa, CA 92626 |

| PROPERTY |
|---|

PROPERTY ADDRESS 64 Halstead Boulevard, Zelienople, PA

ZIP 16063-1911 ,

in the municipality of **Zelienople Boro** ,
County of **Butler** , in the Commonwealth of Pennsylvania.
Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date): 550-S2-BA33A-0000  Deed: 202104090010

Tax ID #(s):

| BUYER'S RELATIONSHIP WITH PA LICENSED BROKER |
|---|

**X No Business Relationship (Buyer is not represented by a broker)**

| Broker (Company) | Licensee(s) (Name) |
|---|---|
| Company Address | Direct Phone(s) |
| | Cell Phone(s) |
| Company Phone | Fax |
| Company Fax | Email |
| Broker is (check only one): | Licensee(s) is (check only one): |
| ☐ Buyer Agent (Broker represents Buyer only) | ☐ Buyer Agent (all company licensees represent Buyer) |
| ☐ Dual Agent (See Dual and/or Designated Agent box below) | ☐ Buyer Agent with Designated Agency (only Licensee(s) named above represent Buyer) |
| | ☐ Dual Agent (See Dual and/or Designated Agent box below) |

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

| SELLER'S RELATIONSHIP WITH PA LICENSED BROKER |
|---|

☐ **No Business Relationship (Seller is not represented by a broker)**

| Broker (Company) Cushman & Wakefield | Licensee(s) (Name) Dana Grau |
|---|---|
| Company Address 310 Grant Street, Pittsburgh , Pa 15219 | Direct Phone(s) (412)391-2636 |
| | Cell Phone(s)  (412)512-3737 |
| Company Phone (412)391-2600 | Fax |
| Company Fax | Email dana.grau@cushwake.com |
| Broker is (check only one): | Licensee(s) is (check only one): |
| X Seller Agent (Broker represents Seller only) | X Seller Agent (all company licensees represent Seller) |
| ☐ Dual Agent (See Dual and/or Designated Agent box below) | ☐ Seller Agent with Designated Agency (only Licensee(s) named above represent Seller) |
| | ☐ Dual Agent (See Dual and/or Designated Agent box below) |

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

| DUAL AND/OR DESIGNATED AGENCY |
|---|

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

**By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Buyer Initials: _SS_    ASC Page 1 of 9    Seller Initials: _RDM_

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020
rev.11/20; rel.6/20

Cushman & Wakefield-Grant Street Associates, 310 Grant Street, Suite 1825 Pittsburgh PA 15219        Phone: 4125123737    Fax:        JEMF 64 Halstead
Dana Grau        Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

EXHIBIT "1"

1. **1.** By this Agreement, dated _____ , Seller hereby agrees to sell and convey to
Buyer, who agrees to purchase, the identified Property.

2. **2. PURCHASE PRICE AND DEPOSITS (3-15)**
   (A)  Purchase Price $ 1,425,000.00 _____
   ( One Million, Four Hundred Twenty-Five Thousand _____
   _____ U.S. Dollars), to be paid by Buyer as follows:
   1.  Initial Deposit, within _____ days (5 if not specified) of Execution Date,
       if not included with this Agreement:                    $ _____ 82,000.00
   2.  Additional Deposit within _____ days of the Execution Date:    $ _____
   3.  _____    $ _____
   Remaining balance will be paid at settlement.
   (B)  All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer
        within 30 DAYS of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by
        personal check.
   (C)  Deposits, regardless of the form of payment and the person designated as payee, will be paid in U.S. Dollars to Broker for Seller
        (unless otherwise stated here: **Deposit shall be held with Title company selected by Buyer** ) , who
        will retain deposits in an escrow account in conformity with all applicable laws and regulations until consummation or termina-
        tion of this Agreement. Only real estate brokers are required to hold deposits in accordance with the rules and regulations of the
        State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending the execution of this Agreement.

3. **3. SETTLEMENT AND POSSESSION (6-13)**
   (A)  Settlement Date is **15 days after Bankruptcy Court Approval** _____ , or before if Buyer and Seller agree.
   (B)  Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless
        Buyer and Seller agree otherwise.
   (C)  At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing where applicable:
        current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer
        fees, together with any other lienable municipal service fees. All charges will be pro-rated for the period(s) covered. Seller will
        pay up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here:
        _____
   (D)  For purposes of prorating real estate taxes, the "periods covered" are as follows:
        1.  Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.
        2.  School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December
            31. School tax bills for all other school districts are for the period from July 1 to June 30.
   (E)  Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here: _____
        _____
   (F)  Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here: _____
        _____
   (G)  Possession is to be delivered by deed, ~~existing keys and physical possession to a vacant Property free of debris, with all structures~~
        ~~broom-clean,~~ at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property
        is subject to a lease.
   (H)  ~~If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and~~
        ~~assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement.~~
        ~~Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will~~
        ~~acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.~~
        ~~☐ Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.~~

4. **4. DATES/TIME IS OF THE ESSENCE (3-15)**
   (A)  Written acceptance of all parties will be on or before: **March 29, 2022**
   (B)  The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the
        essence and are binding.
   (C)  The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by
        signing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, exclud-
        ing the day this Agreement was executed and including the last day of the time period. **All changes to this Agreement should be**
        **initialed and dated.**
   (D)  The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agree-
        ment of the parties.
   (E)  Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms
        and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable
        to all parties, except where restricted by law.

5. **5. FIXTURES AND PERSONAL PROPERTY (6-20)**
   (A)  It is possible for certain items of personal property to be so integrated into the Property that they become fixtures and will be
        regarded as part of the Property and therefore included in a sale. Buyer and Seller are encouraged to be specific when negotiating
        what items will be included or excluded in this sale.

Buyer Initials: [SS]    ASC Page 2 of 9    Seller Initials: _RPM_

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com    JEMF 64 Halstead

EXHIBIT "1"

63   (B)  INCLUDED in this sale are all existing items permanently installed on the Property, free of liens, including plumbing; heating;
64       HVAC equipment; lighting fixtures (including chandeliers and ceiling fans); and water treatment systems, unless otherwise stated
65       below; any remaining heating, cooking and other fuels stored on the Property at the time of settlement. Also included: _____
66       _____
67       _____
68       _____
69   (C)  The following items are not owned by Seller and may be subject to a lease or other financing agreement: _____
70       _____
71   (D)  EXCLUDED fixtures and items: _____
72       _____

73   **6.   ZONING (4-14)**
74       Failure of this Agreement to contain the zoning classification (except in cases where the property {and each parcel thereof, if subdi-
75       vidable} is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if
76       voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.
77       Zoning Classification, as set forth in the local zoning ordinance: _____

78   **7.   FINANCING CONTINGENCY (4-14)**
79       [X]  **WAIVED.** This sale is NOT contingent on financing, although Buyer may obtain financing and/or the parties may include an
80            appraisal contingency.
81       [ ]  **ELECTED.**
82       (A)  This sale is contingent upon Buyer obtaining financing according to the following terms:

| First Loan on the Property | Second Loan on the Property |
|---|---|
| 83 | |
| 84  Loan Amount $ _____ | Loan Amount $ _____ |
| 85  Minimum Term _____ years | Minimum Term _____ years |
| 86  Type of Loan _____ | Type of Loan _____ |
| 87  Interest rate _____ %; however, **Buyer agrees to accept the** | Interest rate _____ %; however, **Buyer agrees to accept the** |
| 88  **interest rate as may be committed by the lender, not to exceed** | **interest rate as may be committed by the lender, not to exceed** |
| 89  a maximum interest rate of _____ %. | a maximum interest rate of _____ %. |

90   (B)  **Financing Commitment Date** _____
91   (C)  Within _____ days (10 if not specified) from the Execution Date of this Agreement, Buyer will make a completed, written appli-
92       cation for the financing terms stated above to a responsible lender(s) of Buyer's choice. **Broker for Buyer, if any, otherwise**
93       **Broker for Seller, is authorized to communicate with the lender(s) to assist in the financing process.**
94   (D)  **Should Buyer furnish false or incomplete information to Seller, Broker(s), or the lender(s) concerning Buyer's legal or**
95       **financial status, or fail to cooperate in good faith in processing the financing application, which results in the lender(s)**
96       **refusing to approve a financing commitment, Buyer will be in default of this Agreement.**
97   (E)  Upon receipt of a financing commitment, Buyer will promptly deliver a copy of the commitment to Seller. Unless otherwise agreed to in
98       writing by Buyer and Seller, if a written commitment is not received by Seller by the above date, this Agreement may be terminated by
99       Buyer or Seller, with all deposit monies returned to Buyer according to the terms of Paragraph 24. Buyer will be responsible for any
100      premiums for mechanics' lien insurance and/or title search, or fee for cancellation of same, if any; AND/OR any premiums for flood
101      insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; AND/OR any appraisal fees
102      and charges paid in advance to lender.

103  **8.   CHANGE IN BUYER'S FINANCIAL STATUS (6-20)**
104      If a change in Buyer's financial status affects Buyer's ability to purchase, Buyer will, within _____ days (5 if not specified) of said
105      change notify Seller and lender(s) to whom the Buyer submitted loan application, if any, in writing. A change in financial status
106      includes, but is not limited to, loss or a change in income; Buyer's having incurred a new financial obligation; entry of a judgment
107      against Buyer. **Buyer understands that applying for and/or incurring an additional financial obligation may affect Buyer's**
108      **ability to purchase.**

109  **9.   SELLER REPRESENTATIONS (1-20)**
110      (A)  **Status of Water**
111          Seller represents that the Property is served by:
112          [X] Public Water  [ ] Community Water  [ ] On-site Water  [ ] None  [ ] _____
113      (B)  **Status of Sewer**
114          1.   Seller represents that the Property is served by:
115              [X] Public Sewer       [ ] Community Sewage Disposal System       [ ] Ten-Acre Permit Exemption (see Sewage Notice 2)
116              [ ] Individual On-lot Sewage Disposal System (see Sewage Notice 1)       [ ] Holding Tank (see Sewage Notice 3)
117              [ ] Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)
118              [ ] None (see Sewage Notice 1)   [ ] None Available/Permit Limitations in Effect (see Sewage Notice 5)
119              [ ] _____
120          2.   **Notices Pursuant to the Pennsylvania Sewage Facilities Act**
121              **Notice 1: There is no currently existing community sewage system available for the subject property.** Section 7 of the
122              Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction, alter,
123              repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a
124              permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency charged with
125              administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The

126  Buyer Initials: _____                 ASC Page 3 of 9                 Seller Initials: _RPM_

127    local agency charged with administering them will be available where the Property is located or that municipality
128    working cooperatively with others.

129    **Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption provisions**
130    **of Section 7 of the Pennsylvania Sewage Facilities Act.** (Section 7 provides that a permit may not be required before installing,
131    constructing, awarding a contract for construction, altering, repairing or connecting to an individual sewage system where a ten-acre
132    parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and site testing were not conducted
133    and that, should the system malfunction, the owner of the Property or properties serviced by the system at the time of a malfunction
134    may be held liable for any contamination, pollution, public health hazard or nuisance which occurs as a result.

135    **Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a**
136    **water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another**
137    **site.** Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
138    tank from the date of its installation or December 14, 1995, whichever is later.

139    **Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-**
140    **tance specified by regulation.** The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
141    provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
142    supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hor-
143    izontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
144    absorption area shall be 100 feet.

145    **Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations.** Sewage facilities
146    are not available for this lot and construction of a structure to be served by sewage facilities may not begin until the municipality com-
147    pletes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations promulgated thereunder.

148    (C)  Seller represents and warrants that Seller has no knowledge except as noted in this Agreement that: (1) The premises have been
149    contaminated by any substance in any manner which requires remediation; (2) The Property contains wetlands, flood plains, or any
150    other environmentally sensitive areas, development of which is limited or precluded by law; (3) The Property contains asbestos,
151    polychlorinated biphenyls, lead-based paint or any other substance, the removal or disposal of which is subject to any law or reg-
152    ulation; and (4) Any law has been violated in the handling or disposing of any material or waste or the discharge of any material
153    into the soil, air, surface water, or ground water.

154    (D)  Seller agrees to indemnify and to hold Broker harmless from and against all claims, demands, or liabilities, including attorneys
155    fees and court costs, which arise from or are related to the environmental condition or suitability of the Property prior to, during,
156    or after Seller's occupation of the Property including without limitation any condition listed in Paragraph 9(C).

157    (E)  Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
158    _____
159    _____

160    (F)  Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
161    ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or public
162    authority has been served upon Seller or anyone on Seller's behalf, including notices relating to violations of zoning, housing,
163    building, safety or fire ordinances that remain uncorrected, and that Seller knows of no condition that would constitute a violation
164    of any such ordinances that remain uncorrected, unless otherwise specified here: _____
165    _____

166    (G)  Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
167    _____

168    (H)  Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.

169    (I)  **Internet of Things (IoT) Devices**
170      1.  The presence of smart and green home devices that are capable of connecting to the Internet, directly or indirectly, and the data
171          stored on those various devices make up a digital ecosystem in the Property sometimes referred to as the "Internet of Things
172          (IoT)." Buyer and Seller acknowledge that IoT devices may transmit data to third parties outside of the control of their owner.
173      2.  On or before settlement, Seller will make a reasonable effort to clear all data stored on all IoT devices located on the Property
174          and included in the sale. Seller further acknowledges that all personal devices owned by Seller (including but not limited to
175          cellular telephones, personal computers and tablets) having connectivity to any IoT device(s) located on the Property will be
176          disconnected and cleared of relevant data prior to settlement. Further, no attempts will be made after settlement by Seller or
177          anyone on Seller's behalf to access any IoT devices remaining on the Property.
178      3.  Following settlement, Buyer will make a reasonable effort to clear all stored data from any IoT device(s) remaining on the
179          Property and to restrict access to said devices by Seller, Seller's agents or any third party to whom Seller may have previously
180          provided access. This includes, but is not limited to, restoring IoT devices to original settings, changing passwords or codes,
181          updating network settings and submitting change of ownership and contact information to device manufacturers and service
182          providers.
183      4.  This paragraph will survive settlement.

184    **10. WAIVER OF CONTINGENCIES (9-05)**
185      **If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental**
186      **conditions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, Buyer's**
187      **failure to exercise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and**
188      **Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement.**

189    Buyer Initials: [DS SS]                    ASC Page 4 of 9                    Seller Initials: RPM

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com                    JEMF 64 Halstead

EXHIBIT "1"

| 190 | **11.** | **BUYER'S DUE DILIGENCE (3-15)** |

191   ☒    **WAIVED.** This sale is NOT contingent upon the results of any inspection(s), although Buyer may inspect the Property (includ-
192      ing fixtures and any personal property specifically listed herein). Buyer agrees to purchase the Property **IN ITS PRESENT**
193      **CONDITION**, regardless of the results of any inspection(s) or findings that Buyer may learn of after the Execution Date of this
194      Agreement.

195   ☐    **ELECTED.** This sale IS contingent upon the results of inspection(s). It is Buyer's responsibility to determine that the con-
196      dition and permitted use of the Property is satisfactory. Buyer may, within _____ days (30 if not specified) from the Execution
197      Date of this Agreement, conduct due diligence (Due Diligence Period), which includes, but is not limited to, verifying that the
198      condition, permitted use, insurability, environmental conditions, boundaries, certifications, deed restrictions, zoning classifi-
199      cations and any other features of the Property are satisfactory. Buyer may request that the property be inspected, at Buyer's
200      expense, by qualified professionals to determine the physical, structural, mechanical and environmental condition of the land,
201      improvements or their components, or for the suitability of the property for Buyer's needs. If, as the result of Buyer's due
202      diligence, Buyer determines that the Property is not suitable for Buyer's needs, Buyer may, prior to the expiration of the Due
203      Diligence Period, terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to
204      the terms of Paragraph 24 of this Agreement. In the event that Buyer has not provided Seller with written notice of Buyer's
205      intent to terminate this Agreement prior to the end of the Due Diligence Period, this Agreement shall remain in full force and
206      effect in accordance with the terms and conditions as more fully set forth in this Agreement.

207   (A)   **Buyer has been given the opportunity to inspect the Property** (including fixtures and any personal property specifically listed
208      herein) **and, subject to the Due Diligence contingency if elected, agrees** to purchase the Property **IN ITS PRESENT CON-**
209      **DITION unless the parties agree otherwise in writing. Buyer's decision to purchase the Property is a result of Buyer's own**
210      **inspections and determinations and not because of or in reliance on any representations made by Seller or any other party.**
211      Buyer acknowledges that Brokers, their licensees, employees, officers or partners have not made an independent examination or
212      determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the
213      permitted uses, nor of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection
214      of any of the systems contained therein.

215   (B)   ~~Any repairs required by this Agreement will be completed in a workmanlike manner.~~

216   (C)   Revised flood maps and changes to Federal law may substantially increase future flood insurance premiums or require insurance
217      for formerly exempt properties. Buyer should consult with one or more insurance agents regarding the need for flood insurance
218      and possible premium increases.

219   **12.**   **NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (4-14)**

220   (A)   In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a
221      property at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value
222      for the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed
223      value of the property and result in a change in property tax.

224   (B)   With the exception of county-wide reassessments, assessment appeal notices, notices of change in millage rates or increases in
225      rates, in the event any other notices, including violations, and/or assessments are received after Seller has signed this Agreement
226      and before settlement, Seller will within _____ days (10 if not specified) of receiving the notices and/or assessments provide a
227      copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:

228      1.   Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
229        notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 26 of this Agreement, OR

230      2.   Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or **fails**
231        **within the stated time to notify Buyer whether Seller will comply,** Buyer will notify Seller in writing within _____ days
232        (10 if not specified) that Buyer will:

233        a.   Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
234          Paragraph 26 of this Agreement, OR

235        b.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
236          Paragraph 24 of this Agreement.

237      **If Buyer fails to respond** within the time stated in Paragraph 12(B) **(2) or fails to terminate** this Agreement by written notice to
238      Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 26 of this Agreement.

239   (C)   If required by law, within 30 DAYS from the Execution Date of this Agreement, but in no case later than 15 DAYS prior to
240      Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
241      of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of the
242      Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to Seller.

243   (D)   Seller has no knowledge of any current or pending condemnation or eminent domain proceedings that would affect the Property. If
244      any portion of the Property should be subject to condemnation or eminent domain proceedings after the signing of this Agreement,
245      Seller shall immediately advise Buyer, in writing, of such proceedings. Buyer will have the option to terminate this Agreement by
246      written notice to Seller within _____ days (15 days if not specified) after Buyer learns of the filing of such proceedings, with
247      all deposit monies returned to Buyer according to the terms of Paragraph 24 of this Agreement. **Buyer's failure to provide notice**
248      **of termination within the time stated will constitute a WAIVER of this contingency and all other terms of this Agreement**
249      **remain in full force and effect.**

250   **13.**   **TAX DEFERRED EXCHANGE (4-14)**

251   (A)   If Seller notifies Buyer that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
252      Buyer agrees to cooperate with Seller in connection with such exchange, including the execution of such documents as may be
253      reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any

254    Buyer Initials: _SS_          ASC Page 5 of 9          Seller Initials: _RPW_

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com      JEMF 64 Halstead

EXHIBIT "1"

255 additional costs associated with the assignment are paid solely by Seller. Buyer is aware that Seller anticipates assigning Seller's
256 interest in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Buyer shall not be
257 required to execute any note, contract, deed or other document providing any liability which would survive the exchange, nor shall
258 Buyer be obligated to take title to any property other than the Property described in this Agreement. Seller shall indemnify and
259 hold harmless Buyer against any liability which arises or is claimed to have arisen from any aspect of the exchange transaction

260 (B) If Buyer notifies Seller that it wishes to enter into a tax deferred exchange for the Property pursuant to the Internal Revenue Code,
261 Seller agrees to cooperate with Buyer in connection with such exchange, including the execution of such documents as may be
262 reasonably necessary to conduct the exchange, provided that there shall be no delay in the agreed-to settlement date, and that any
263 additional costs associated with the exchange are paid solely by Buyer. Seller is aware that Buyer has assigned Buyer's interest
264 in this Agreement to a third party under an Exchange Agreement and consents to such assignment. Seller shall not be required
265 to execute any note, contract, deed or other document providing any liability which would survive the exchange. Buyer shall
266 indemnify and hold harmless Seller against any liability which arises or is claimed to have arisen from any aspect of the exchange
267 transaction.

**14. COMMERCIAL CONDOMINIUM (10-01)**
268
269 [X] NOT APPLICABLE.
270 [ ] APPLICABLE. Buyer acknowledges that the condominium unit to be transferred by this Agreement is intended for nonresidential
271 use, and that Buyer may agree to modify or waive the applicability of certain provisions of the Uniform Condominium Act of
272 Pennsylvania (68 Pa.C.S. §3101 *et seq.*).

**15. TITLES, SURVEYS AND COSTS (6-20)**
273
274 (A) The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
275 ular rates, free and clear of all liens, encumbrances, and easements, **excepting however** the following: existing deed restrictions;
276 historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
277 ground; easements of record; and privileges or rights of public service companies, if any.

278 (B) Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
279 (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
280 and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.

281 (C) Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal descrip-
282 tion of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by Buyer or
283 required by the mortgage lender will be obtained and paid for by Buyer.

284 (D) ~~If a change in Seller's financial status affects Seller's ability to convey title to the Property as set forth in this Agreement on or~~
285 ~~before the Settlement Date, or any extension thereof, Seller shall, within _____days (5 if not specified) notify Buyer, in writing.~~
286 ~~A change in financial status includes, but is not limited to, Seller filing bankruptcy; filing of a foreclosure law suit against the~~
287 ~~Property; entry of a monetary judgment against Seller; notice of public tax sale affecting the Property; and Seller learning that~~
288 ~~the sale price of the Property is no longer sufficient to satisfy all liens and encumbrances against the Property. In the event of the~~
289 ~~death of Seller, the representative of the estate, or a surviving Seller shall immediately notify Buyer.~~

290 (E) If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates, as
291 specified in Paragraph 15(A), Buyer may terminate this Agreement by written notice to Seller, or take such title as Seller can convey.
292 If the title condition precludes Seller from conveying title, Buyer's sole remedy shall be to terminate this Agreement. Upon termina-
293 tion, all deposit monies will be returned to Buyer according to the terms of Paragraph 24 of this Agreement and Seller will reimburse
294 Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and
295 for those items specified in Paragraph 15(B) items (1), (2), (3) and in Paragraph 15(C).

296 (F) Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representa-
297 tion about the status of those rights unless indicated elsewhere in this Agreement.
298 [ ] **Oil, Gas and Mineral Rights Addendum (PAR Form OGM) is attached and made part of this Agreement.**

299 **(G) COAL NOTICE (Where Applicable)**
300 THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDER-
301 NEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COM-
302 PLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND
303 ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of
304 the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence
305 resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsid-
306 ence by a private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose
307 of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27,
308 1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.

309 (H) The Property is not a "recreational cabin" as defined in the Pennsylvania Construction Code Act unless otherwise stated here: _____
310

311 (I) 1. This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here: _____
312

313 [ ] **Private Transfer Fee Addendum (PAR Form PTF) is attached and made part of this Agreement.**

314 2. **Notice Regarding Private Transfer Fees:** In Pennsylvania, Private Transfer Fees are defined and regulated in the Private
315 Transfer Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that
316 is payable upon the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obli-
317 gation to pay the fee or charge runs with title to the property or otherwise binds subsequent owners of property, regardless of
318 whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price or
319 other consideration given for the transfer." A Private Transfer Fee must be properly recorded to be binding, and sellers must

320 Buyer Initials: _SS_    ASC Page 6 of 9    Seller Initials: _APA_

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    JEMF 64 Halstead

EXHIBIT "1"

321  disclose the existence of the Transfer Fee to prospective buyers. If a Transfer Fee is not properly recorded or disclosed,
322  the Act gives certain rights and protections to buyers.

**16. MAINTENANCE AND RISK OF LOSS (10-06)**

323
324  (A) Seller will maintain the Property, grounds, fixtures and personal property specifically listed in this Agreement in its present con-
325  dition, normal wear and tear excepted.
326  (B) Seller will promptly notify the Buyer if, at any time prior to the time of settlement, all or any portion of the Property is destroyed,
327  or damaged as a result of any cause whatsoever.
328  (C) Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not
329  replaced, Buyer will:
330  1. Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR
331  2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
332  Paragraph 24 of this Agreement.

**17. RECORDING (9-05)**

333
334  This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer
335  causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.

**18. ASSIGNMENT (1-10)**

336
337  This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assign-
338  able, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless
339  otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.

**19. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**

340
341  (A) The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the
342  laws of the Commonwealth of Pennsylvania.
343  (B) ~~The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance by either~~
344  ~~party submitted to a court shall be filed exclusively in and in the state or federal courts sitting in the Commonwealth of Pennsylvania.~~
345  ~~Seller understands that any documentation provided under this provision may be disclosed to the Internal Revenue Service by~~
346  ~~Buyer, and that any false statements contained therein could result in punishment by fine, imprisonment, or both.~~

**20. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (6-13)**

347
348  The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing
349  for community notification of the presence of certain convicted sex offenders. **Buyers are encouraged to contact the municipal**
350  **police department or the Pennsylvania State Police** for information relating to the presence of sex offenders near a particular prop-
351  erty, or to check the information on the Pennsylvania State Police Web site at www.pamegansLaw.state.pa.us.

**21. CERTIFICATION OF NON-FOREIGN INTEREST (10-01)**

352
353  ☐ Seller **IS** a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate subject to Section 1445 of the
354  Internal Revenue Code, which provides that a transferee (Buyer) of a U.S. real property interest must withhold tax if the transferor
355  (Seller) is a foreign person.
356  ☒ Seller is **NOT** a foreign person, foreign corporation, foreign partnership, foreign trust, or a foreign estate as defined by the Internal
357  Revenue Code, or is otherwise not subject to the tax withholding requirements of Section 1445 of the Internal Revenue Code. To
358  inform Buyer that the withholding of tax is not required upon the sale/disposition of the Property by Seller, Seller hereby agrees
359  to furnish Buyer, at or before closing, with the following:
360  ☒ An affidavit stating, under penalty of perjury, the Seller's U.S. taxpayer identification number and that the Seller is not a for-
361  eign person.
362  ☐ A "qualifying statement," as defined by statute, that tax withholding is not required by Buyer.
363  ☐ Other: _____

**22. REPRESENTATIONS (1-10)**

364
365  (A) ~~All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licens-~~
366  ~~ees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.~~
367  ~~This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants,~~
368  ~~representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This Agreement will not~~
369  ~~be altered, amended, changed or modified except in writing executed by the parties.~~
370  (B) Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.

**23. BROKER INDEMNIFICATION (6-13)**

371
372  (A) Buyer and Seller represent that the only Brokers involved in this transaction are: **Cushman & Wakefield**
373
374  and that the transaction has not been brought about through the efforts of anyone other than said Brokers. It is agreed that if any
375  claims for brokerage commissions or fees are ever made against Buyer or Seller in connection with this transaction, each party
376  shall pay its own legal fees and costs in connection with such claims. It is further agreed that Buyer and Seller agree to indemnify
377  and hold harmless each other and the above-listed Brokers from and against the non-performance of this Agreement by either
378  party, and from any claim of loss or claim for brokerage commissions, including all legal fees and costs, that may be made by any
379  person or entity. This paragraph shall survive settlement.
380  (B) Seller and Buyer acknowledge that any Broker identified in this Agreement: **(1)** Is a licensed real estate broker; **(2)** Is not an
381  expert in construction, engineering, code or regulatory compliance or environmental matters and was not engaged to provide
382  advice or guidance in such matters, unless otherwise stated in writing; and **(3)** Has not made and will not make any representa-
383  tions or warranties nor conduct investigations of the environmental condition or suitability of the Property or any adjacent prop-
384  erty, including but not limited to those conditions listed in Paragraph 9(C).

385  Buyer Initials: _____SS_____       ASC Page 7 of 9       Seller Initials: RPh

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com       JEMF 64 Halstead

EXHIBIT "1"

**24. DEFAULT, TERMINATION AND REMEDIES, RETURN OF DEPOSITS (1-18)**

    (A) Where Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 24(B), and this Agreement will be VOID. Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.

    (B) Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:

        1. If this Agreement is terminated prior to settlement and there is no dispute over entitlement to deposit monies. A written agreement signed by both parties is evidence that there is no dispute regarding deposit monies.

        2. If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller, directing Broker how to distribute some or all of the deposit monies.

        3. According to the terms of a final order of court.

        4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute the deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 24 (C))

    (C) Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved _____ days (180 if not specified) days after the Settlement Date stated in Paragraph 3(A) (or any written extensions thereof) or following date of termination of the Agreement, whichever is earlier, then the Broker holding the deposit monies will, within 30 days of receipt of Buyer's written request, distribute the deposit monies to Buyer unless the Broker is in receipt of verifiable written notice that the dispute is the subject of litigation or mediation. If Broker has received verifiable written notice of litigation or mediation prior to the receipt of Buyer's request for distribution, Broker will continue to hold the deposit monies until receipt of a written distribution agreement between Buyer and Seller or a final court order. Buyer and Seller are advised to initiate litigation or mediation for any portion of the deposit monies prior to any distribution made by Broker pursuant to this paragraph. Buyer and Seller agree that the distribution of deposit monies based upon the passage of time does not legally determine entitlement to deposit monies, and that the parties maintain their legal rights to pursue litigation even after a distribution is made.

    (D) Buyer and Seller agree that Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 24 or Pennsylvania law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation regarding deposit monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming them in litigation.

    (E) Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer:

        1. Fail to make any additional payments as specified in Paragraph 2, OR

        2. Furnish false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning Buyer's legal or financial status, OR

        3. Violate or fail to fulfill and perform any other terms or conditions of this Agreement.

    (F) **Unless otherwise checked in Paragraph 24(G),** Seller may elect to retain those sums paid by Buyer, including deposit monies:

        1. On account of purchase price, OR

        2. As monies to be applied to Seller's damages, OR

        3. As liquidated damages for such default.

    (G) ☒ **SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUIDATED DAMAGES.**

    (H) If Seller retains all sums paid by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 24 (F) or (G), Buyer and Seller are released from further liability or obligation and this Agreement is VOID.

    (I) Brokers and licensees are not responsible for unpaid deposits.

**25.** ~~ARBITRATION OF DISPUTES (1-00)~~

~~Buyer and Seller agree to arbitrate any dispute between them that cannot be amicably resolved. After written demand for arbitration by either Buyer or Seller, each party will select a competent and disinterested arbitrator. The two so selected will select a third. If selection of the third arbitrator cannot be agreed upon within 30 days, either party may request that selection be made by a judge of a court of record in the county in which arbitration is pending. Each party will pay its chosen arbitrator, and bear equally expenses for the third and all other expenses of arbitration. Arbitration will be conducted in accordance with the provisions of Pennsylvania Common Law Arbitration 42 Pa. C.S.A. §7341 et seq. This agreement to arbitrate disputes arising from this Agreement will survive settlement.~~

**26. RELEASE (9-05)**

Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injury and property damage and all of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects, radon, lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage disposal system or deficiencies in the on-site water service system, or any defects or conditions on the Property. Should Seller be in default under the terms of this Agreement or in violation of any Seller disclosure law or regulation, this release does not deprive Buyer of any right to pursue any remedies that may be available under law or equity. This release will survive settlement.

**27. REAL ESTATE RECOVERY FUND (1-18)**

A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-3658.

**28. COMMUNICATIONS WITH BUYER AND/OR SELLER (6-13)**

Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be satisfied by communication/delivery to the Broker for Buyer, if any, except where required by law. If there is no Broker for Buyer, those provisions may be satisfied only by communication/delivery being made directly to the Buyer, unless otherwise agreed to by the

Buyer Initials: _SS_          ASC Page 8 of 9          Seller Initials: _RPA_

EXHIBIT "1"

DocuSign Envelope ID: 619739FA-FD46-4293-B048-D078F482246B

452   parties. Wherever this Agreement contains a provision requiring notice or Communication/delivery to a Seller, that provision shall
453   be satisfied by communication/delivery to the Broker for Seller, if any. If there is no Broker for Seller, those provisions may be satisfied
454   only by communication/delivery being made directly to the Seller, unless otherwise agreed to by the parties.

455   **29. NOTICE BEFORE SIGNING (4-14)**
456   Unless otherwise stated in writing, Buyer and Seller acknowledge that Brokers are not experts in legal or tax matters and that Brokers
457   have not made, nor will they make, any representations or warranties nor conduct research of the legal or tax ramifications of this
458   Agreement. Buyer and Seller acknowledge that Brokers have advised them to consult and retain experts concerning the legal and tax
459   effects of this Agreement and the completion of the sale, as well as the condition and/or legality of the Property, including, but not
460   limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Buyer and Seller acknowledge
461   receipt of a copy of this Agreement at the time of signing. **This Agreement may be executed in one or more counterparts,** each of
462   which shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement of the Parties.
463   **WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Return of this Agreement, and any addenda and amend-
464   ments ,including **return by electronic transmission**, bearing the signatures of all parties, constitutes acceptance by the parties.

465   **30. SPECIAL CLAUSES (4-14)**
466   (A)   **The following are part of this Agreement if checked:**
467   ☐ Appraisal Contingency Addendum to Agreement of Sale (PAR Form ACA)
468   ☐ Short Sale Addendum to Agreement of Sale (PAR Form SHS)
469   ☐ Zoning Approval Contingency Addendum to Agreement of Sale (PAR Form ZA)
470   ☒ **Bankruptcy Addendum**
471   _____
472   _____
473   (B)   **Additional Terms:** Property shall be delivered As Is.
474
475   _____ Buyer has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa.
476   Code §35.336.

477   _____ Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

478   _____ Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit money)
479   before signing this Agreement.

480   **BUYER**  *Sami Souid*                                          **DATE**   3/29/2022
                 B1DAB8FCCFA54DB...
481   Mailing Address _____
482   Phone(s) _____  Fax _____  Email _____
483   **BUYER** _____  **DATE** _____

484   Mailing Address _____
485   Phone(s) _____  Fax _____  Email _____
486   **BUYER** _____  **DATE** _____

487   Mailing Address _____
488   Phone(s) _____  Fax _____  Email _____
489   **AUTHORIZED REPRESENTATIVE** _____
490   Title _____
491   **COMPANY** _____

492   Seller has received the Consumer Notice, where applicable, as adopted by the State Real Estate Commission at 49 Pa. Code § 35.336.
493   Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

494   **VOLUNTARY TRANSFER OF CORPORATE ASSETS** (if applicable): The undersigned acknowledges that he/she is authorized
495   by the Board of Directors to sign this Agreement on behalf of the Seller corporation and that this sale does not constitute a sale, lease, or
496   exchange of all or substantially all the property and assets of the corporation, such as would require the authorization or consent of the
497   shareholders pursuant to 15 P.S. §511.
498   **SELLER**  *(signature)*                                        **DATE**   MARCH 30, 2022

499   Mailing Address _____
500   Phone(s) _____  Fax _____  Email _____
501   **SELLER** _____  **DATE** _____

502   Mailing Address _____
503   Phone(s) _____  Fax _____  Email _____
504   **SELLER** _____  **DATE** _____

505   Mailing Address _____
506   Phone(s) _____  Fax _____  Email _____
507   **AUTHORIZED REPRESENTATIVE** _____
508   Title _____
509   **COMPANY** _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com                JEMF 64 Halstead
EXHIBIT "1"

## BANKRUPTCY ADDENDUM TO AGREEMENT
## FOR THE SALE OF COMMERCIAL REAL ESTATE

This Bankruptcy Addendum ("Addendum") to Agreement for the Sale of Commercial Real Estate ("Sale Agreement") is entered into on March 29, 2022, by and between **JEMF PA 64, LLC** ("Buyer") and **3200 MYERS STREET PARTNERS, LLC**, the debtor in possession in the bankruptcy case entitled *In re 3200 Myers Street Partners, LLC*, Case No. 8:22-bk-10057 SC ("Seller" or "Debtor") pursuant to the terms and conditions as follows:

### RECITALS

WHEREAS: The Debtor in the bankruptcy proceeding entitled *In re 3200 Myers Street Partners, LLC*, is the owner of record of certain real property commonly known as: 64 Halstead Blvd., Zelienople PA 16063-1911, in Butler County, Pennsylvania ("Property"). The Property is now property of the Debtor's bankruptcy estate ("Estate").

WHEREAS: The Debtor filed a Voluntary Petition under Chapter 11 of Title 11, United States Bankruptcy Code, on January 14, 2022, initiating Case No. 8:22-bk-10057 SC in the United States Bankruptcy Court, Central District of California ("Bankruptcy Case").

WHEREAS: Buyer and Seller have entered into that certain Sale Agreement dated March 29, 2022, for the sale of the Property to Buyer for $1,425,000.  The parties' Sale Agreement and the Addendum shall from hereon together be referred to as the "Agreement."

WHEREAS: Pursuant to 11 U.S.C. Section 363, Debtor will seek a Court Order in the Bankruptcy Case authorizing the sale of the Property pursuant to the terms and conditions set forth in the Agreement.

WHEREAS: Any sale of the Property is subject to certain terms and conditions imposed by the Bankruptcy Code and ancillary procedures, and any sale of the Property must be approved by an Order of the Bankruptcy Court.

### NOW THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

### CONDITIONS OF SALE

1.      Court Approval: Seller agrees to proceed in good faith to obtain Court approval for the sale of the Property and the Agreement within reasonable time period after execution of the Agreement.

2.      Broker's Compensation: Brokers is entitled to compensation only upon recordation of a deed or other evidence of title.

3.      No Assignment: The Agreement is between Buyer and Seller. Buyer shall have no right to assign the Escrow, Agreement, or transfer the Property concurrent with closing, without the consent of Seller.

4.    Title Insurance: The title insurance policy shall be subject only to liens, encumbrances, clouds and other matters as may appear on the preliminary title report, that are not to be removed at the close of Escrow and have not been objected to by Buyer. Should Seller be unwilling or unable to eliminate those title matters disapproved by Buyer as above, Seller may terminate the Agreement, or, should Seller fail to deliver good and marketable title as provided above, Seller or Buyer may terminate the Agreement. In either case, the Buyer's deposit shall be returned to Buyer, and Buyer shall have no recourse against Seller or its attorneys, or any real estate agent, broker or attorney involved in this transaction.

5.    Limitations of Sale: The parties acknowledge that there are limitations as to the extent, type and character of the Agreement under which Seller can convey the Property. Seller proposes to sell the Property subject to certain limitations. The parties hereby acknowledge that they understand the terms under which this Property is to be conveyed may vary substantially from the normal customs and trade within the real estate industry. Except where expressly mandated by operation of law, Buyer consents to any such modifications and amendments. Buyer acknowledges that it is purchasing the Property from Seller "AS IS" without warranties of any kind expressed or implied, being given by Seller, concerning the condition of the Property or the quality of the title thereto, or any other matters relating to the Property. Buyer represents and warrants that it is purchasing the Property as a result of its own investigations and is not buying the Property pursuant to any representation made by any broker, agent, accountant, attorney or employee acting at the direction or on the behalf of Seller. Buyer acknowledges that Buyer has inspected the Property, and upon closing of Escrow governed by the Agreement, Buyer forever waives, for itself, its successors and assigns, any and all claims against Seller, its attorneys, agents, and employees, arising or which might otherwise arise in the future concerning the Property.

6.    Seller's Liability: Buyer acknowledges that in the event that the Seller fails or refuses to complete the transaction for any reason, then the limit of the Seller's liability is only to return any money paid to the Estate by Buyer, without deduction.

7.    Hold Harmless: Buyer understands the terms and conditions of the entire Agreement and holds the Estate, its attorneys, agents and employees harmless from any liabilities arising from the Agreement.

8.    Bankruptcy Court Jurisdiction: Any and all disputes, which involve in any manner the Estate or its realtors, brokers, agents, arising from this Agreement or relating in any manner to the Property, shall be resolved only in the United States Bankruptcy Court, Central District of California, Santa Ana Division.

9.    Buyer is aware the Agreement is contingent upon Bankruptcy Court approval and subject to overbid procedures.  Seller intends to request reasonable bidding procedures be approved by the Bankruptcy Court which shall include, but not be limited to, a request that the initial overbid amount be $50,000 greater than price Buyer has agreed to pay for the Property.  Seller will request that subsequent bidding be conducted in $1,000 increments.

10.    Buyer has NO CONTINGENCIES in this transaction; including but not limited
to the contingency of obtaining financing and appraisal, except for the contingencies specified in
the Agreement.

11.    Deposit.

(a)  The Deposit will be applied to the purchase price. Said Deposit will be fully refundable if
the Seller accepts and the Bankruptcy Court approves an overbid of another bidder or if the
Bankruptcy Court does not approve this sale. Should Buyer default and fail to perform its
obligations and timely close escrow, the Deposit shall become nonrefundable and shall be
forfeited by Buyer and retained by Seller as liquidated damages in the event of default by Buyer.

(b)  Upon approval by the Bankruptcy Court of a winning bid, the Deposit of such winning
bidder shall become non-refundable if the Agreement of Sale with such winning bidder is
thereafter terminated by the Estate as a result of a breach by the winning bidder of its obligations
thereunder. The Deposit of a back-up bidder shall remain on deposit with the Estate, pending the
closing date, and such deposit shall become non-refundable if the back-up bidder becomes the
winning bidder and its Agreement of Sale is thereafter terminated by the Estate as a result of a
breach by such back-up bidder. In either case, the forfeiture of the Deposit shall constitute
liquidated damages and the Estate shall retain no other rights, remedies, claims, counterclaims
and defenses against Buyer, back-up bidder or such other qualified bidder, as applicable.

12.    Breakup Fee.  In the event that a qualified bidder other than the Buyer is the winning
bidder for the Property, Buyer shall be entitled to receive a breakup fee in the amount $25,000,
paid directly to the Buyer upon the closing of the sale from the proceeds thereof.

13.    In addition to the $82,000 deposit, Buyer will deposit the balance of its winning bid, *i.e.*,
the purchase price set forth in the Agreement or an accepted overbid, into escrow on or before
the close of escrow.

I, Buyer herein, have reviewed the foregoing and understand the terms and conditions set
forth herein, and further agree to purchase the Property pursuant to said terms and conditions.

Dated:  3/29/2022                         JEMF PA 64, LLC
                                          DocuSigned by:

                                    By:   Sami Souid
                                          B1DABBFCCFA54DB...

                                    Name: Sami Souid

                                    Title: partner

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

EXHIBIT "1"

I, Seller, agree to sell the Property pursuant to the terms and conditions set forth herein.

Dated: *MARCH 30, 2022*

**3200 MYERS STREET PARTNERS, LLC,**
A California Limited Liability Company

By: _____

Name: Robert Mosier

Title: Chief Restructuring Officer

# EXHIBIT 2

EXHIBIT 2



## First American

# Commitment

**ALTA Commitment for Title Insurance**

ISSUED BY

**First American Title Insurance Company**

File No: 8114-5946998

**COMMITMENT FOR TITLE INSURANCE**
**Issued By**
***FIRST AMERICAN TITLE INSURANCE COMPANY***
**NOTICE**

**IMPORTANT-READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

**COMMITMENT TO ISSUE POLICY**

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, ***First American Title Insurance Company***, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

***First American Title Insurance Company***

Dennis J. Gilmore, President

Greg L. Smith, Secretary

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 1 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |
|---|---|---|

EXHIBIT "2"

**COMMITMENT CONDITIONS**

1. **DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I—Requirements;
   (f) Schedule B, Part II—Exceptions; and
   (g) a counter-signature by the Company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.

5. **LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
       (i) comply with the Schedule B, Part I—Requirements;
       (ii) eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
       (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 2 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |

EXHIBIT "2"

## 6.   LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT

(a)  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b)  Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c)  Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d)  The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

## 7.   IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

## 8.   PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

## 9.   ARBITRATION

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Policy Amount is $2,000,000 or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), | Page 3 of 11 | ALTA Commitment for Title Insurance (8-1-16) |
|---|---|---|
| 5030042-BI&BII(6-9-17) | | Pennsylvania |

| First American | ALTA Commitment for Title Insurance |
|---|---|
| | ISSUED BY |
| **Schedule A** | **First American Title Insurance Company** |
| | File No: 8114-5946998 |

***Transaction Identification Data for reference only:***

Issuing Agent: Clear Abstract Settlement, LLC
ALTA Universal ID:
Commitment Number:
Property Address: 64 Halstead Boulevard, Zelienople, PA 16063-1911

Issuing Office:
Loan ID Number:
Issuing Office File Number: 64 Halstead
Revision Number:

### SCHEDULE A

1.  Commitment Date: March 04, 2022 @ 8:00 AM

2.  Policy to be issued:

    (a) ☐ ALTA® _____ Policy
        Proposed Insured:
        Proposed Policy Amount: $

    (b) ☒ ALTA® _____ Policy
        Proposed Insured: TBD, its successors and/or assigns as defined in the Conditions of the policy, as their interests may appear.
        Proposed Policy Amount: $600,000.00

    (c) ☐ ALTA® _____ Policy
        Proposed Insured:
        Proposed Policy Amount: $

3.  The estate or interest in the Land described or referred to in this Commitment is Fee Simple.

4.  Title to the Fee Simple estate or interest in the Land is at the Commitment Date vested in: 3200 Myers Street Partners, LLC, a California limited liability company
    And was acquired by:

    Deed from 3200 Myers Street Partners, LLC, a California limited liability company erroneously identified in the prior deed as 3200 Myers Street Properties, LLC to 3200 Myers Street Partners, LLC, a California limited liability company, dated 03/26/2021 and recorded 04/09/2021 in the Office of the Recorder of Deeds in and for the County of Butler in Book , Page , Instrument No.: 202104090010156.

5.  The Land is described as follows:

    **See Exhibit "A" attached hereto and made a part hereof**

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 4 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |

Clear Abstract Settlement, LLC

By: _____
    Authorized Signatory

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

EXHIBIT "2"

 **First American**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: 8114-5946998

# Schedule BI

Issuing Office File Number: 64 Halstead

## SCHEDULE B, PART I

### Requirements

All of the following Requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5. Original photo identification for all parties to the transaction must be provided.

6. Proof to be furnished that as to each grantor/mortgagor who is an individual, if presently married, that he/she is neither separated from his/her spouse nor a party to any pending divorce proceeding in any jurisdiction, otherwise, the non-record spouse must join in the deed or mortgage contemplated hereunder.

7. Proof that there are no overdue support obligations of record with the Domestic Relations Section of the parties to this transaction, up through the date of recording of the instruments to be insured.

8. Town, County and School Taxes and Water and Sewer Rents for the prior three years. (Receipts to be produced and filed with the Company.) If certification of payment or amount due is obtained from the taxing and municipal authorities in lieu of such receipts, proof must be provided that the taxing and municipal authorities have not turned collection of any unpaid amounts over to a collection agency or law firm. Absent such proof, or if the taxing or municipal authorities have turned collection over to a collection agency or law firm, then additional certification of payment or amount due to be obtained from such collection agency or law firm.

9. Real Estate Taxes and Municipal Claims (If paid, receipts are to be produced and filed with the Company.)
   PARCEL IDENTIFICATION NUMBER: 550-S2-BA33A-0000

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 6 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |
|---|---|---|

ASSESSMENT: $17,290.00

10. The Company may make other requirements or exceptions upon its review of the documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

11. MORTGAGE: NONE

12. JUDGMENTS: NONE

13. Proceedings pending in the Bankruptcy Court of the Central District of the U.S. District Court, California, entitled in re: 3200 Myers Street Partners, LLC, a California limited liability company, debtor, Case No. 8:2022bk10057, filed on 01/14/2022 AND Case No. 8:2022bk10191, filed on 02/03/2022

14. Homeowners Association Dues, if any.

15. As to 3200 Myers Street Partners LLC, the following must be furnished:

    a. Certificate of Organization and all amendments thereto filed with the Department of State of the State of Pennsylvania.

    b. Operating Agreement and all amendments thereto.

    c. Proof that all the consents and requirements of the Operating Agreement have been met with respect to the authority of the members or managers to execute and deliver the title documents on behalf of 3200 Myers Street Partners LLC for this transaction.

    d. Settled taxes due to the Commonwealth of Pennsylvania, if any.

    e. Certificate of Good Standing (only if the limited liability company is a foreign entity, i.e., created in a state other than Pennsylvania).

16. Real estate taxes returned to the Tax Claim Bureau of Butler County not certified. Proper certification to be obtained from said bureau.

17. Taxes for the year(s) 2021 have been returned to the Tax Claim Bureau of the County of Butler as unpaid and liened and are payable at that office only.

18. Real Estate Taxes and Municipal Claims (If paid, receipts are to be produced and filed with the Company).

    Tax Account Number: 550-S2-BA33A-0000   Assessment: $17,290.00

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 7 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |
| --- | --- | --- |

EXHIBIT "2"

 *First American*

**Schedule BII**

ALTA Commitment for Title Insurance

ISSUED BY

**First American Title Insurance Company**

File No: 8114-5946998

Issuing Office File Number: 64 Halstead

## SCHEDULE B, PART II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.  Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

2.  Rights or claims by parties in possession or under the terms of any unrecorded lease or agreement(s) of sale.

3.  Any variation in location of lines or dimensions or other matters which an accurate survey would disclose.

4.  Easements, or claims of easements, not shown by the Public Records.

5.  Any lien or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6.  Possible additional tax increase based on additional assessments.

7.  Accuracy of area content not insured.

8.  Title to that part of the premises lying in the bed and right of way of all roads, driveways and alleyways is subject to the public and private rights therein.

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 8 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |
|---|---|---|

9.    Coal and mining rights and all rights related thereto.

      NOTICE: THIS DOCUMENT DOES NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE
      TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR
      REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL HAVE THE COMPLETE LEGAL
      RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO
      THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH
      LAND. THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL
      RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS
      INSTRUMENT. (SEE 52 P.S. 1551)

10.   Oil, gas or other mineral interests and all rights incident thereto now or previously conveyed,
      transferred, leased, excepted or reserved.

11.   Subject to all matters shown on the Plan as recorded in the Recorder's Office of Butler County,
      Pennsylvania in Plan Book 208, Page 46.

12.   Rights and privileges as set forth in Deed Book 614, Page 66.

13.   Rights granted to Universal Manufacturing Corp. as set forth in Deed Book 634, Page59.

14.   Rights granted to American Natural Gas Company as set forth in Deed Book 419, Page 398.

15.   Rights granted to Peoples Natural Gas Company as set forth in Deed Book 523, Page 43.

16.   Rights granted to Pennsylvania Power Company as set forth in Deed Book 634, Page 55.

17.   Easement for access as set forth in Deed Book 2808, Page 453. Subject to the proportionate part of
      the expense for keeping same in good order, condition and repair at all times hereafter forever.

18.   Declaration of Taking as set forth in Deed Book 2920, Page 763

19.   Subject to rights of other littoral/riparian owners abutting Connoquenessing Creek, a body of water
      which flows through or along the subject premises.

20.   Rights granted to B & O Railroad as set forth in Instrument No. 200711130029166.

21.   Rights-of-way for railroad, switch tracks, spur tracks, railway facilities and other related easements, if
      any, on and across the Land



First American

**Notices -- Where Sent**

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue
Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the
Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses
are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17),<br>5030042-BI&BII(6-9-17) | Page 9 of 11 | ALTA Commitment for Title Insurance (8-1-16)<br>Pennsylvania |

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 1 First American Way, Santa Ana, CA 92707 (claims.nic@firstam.com).

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

EXHIBIT "2"



**First American**

Exhibit A

ISSUED BY
**First American Title Insurance Company**

File No: 8114-5946998

Issuing Office File Number: 64 Halstead

The land referred to herein below is situated in the County of Butler, State of Pennsylvania, and described as follows:

ALL THAT CERTAIN piece, parcel or lot of land lying and being situate in the Borough of Zelienople, County of Butler and Commonwealth of Pennsylvania, being Parcel 2-A of the Vesuvius USA Corporation Subdivision Plan, recorded in Plan Book 208, Page 46 in the Office of the Recorder of Deeds in and for the County of Butler and being a part of lands described as Parcel 2 in Deed Book Volume 1417, Page 854, described as follows, to wit:

BEGINNING at a point being the Southeast corner of Parcel 2 as above mentioned and also being an iron pin at the Southeast corner of this Parcel 2-A described and said point being at the intersection of lands of the Zelienople Borough Water Works and lands now or formerly of the B &O Railroad; thence along lands of said B & O Railroad, by a curve to the left, having a radius of 2,512.21 feet, an arc distance of 523.09 feet to a point; thence continuing South 69° 20' 02" West, a distance of 123.79 feet to a point; thence along remaining lands of Vesuvius USA Corporation and said lands being Parcel 2-B, the following courses and distances: North 18° 39' 29" West, a distance of 166.34 feet to a point; thence North 09° 43' 50" West, a distance of 50.00 feet to a point; thence North 03° 19' 34" West, a distance of 110.11 feet to a point; thence North 09° 00' 52" West, a distance of 209.81 feet to a point; thence continuing along or near the Southerly bank of the Connoquenessing Creek, South 87° 34' 58" East, a distance of 257.94 feet to a point; thence South 74° 18' 58" East, a distance of 475.68 feet to a point, and said point being the Northwest corner of lands of the aforementioned Zelienople Borough Water Works, as recorded in Deed Book 358, Page 108; thence along lands of said Zelienople Borough Water Works, South 01° 40' 52" East, a distance of 208.45 feet to a point, being the point of beginning.

PARCEL NO. 550-S2-BA33A-0000

BEING the same premises which GP Gwinnett, LLC a Georgia limited liability company, by Deed dated 05/18/2018 and recorded 06/06/2018 in the Office of the Recorder of Deeds in and for the County of Butler in Instrument No. 201806060011094, granted and conveyed unto 3200 Myers Street Properties, LLC.

ALSO BEING the same premises which 3200 Myers Street Partners, LLC, a California limited liability company erroneously identified in the prior deed as 3200 Myers Street Properties, LLC., by Corrective Deed dated 03/26/2021 and recorded 04/09/2021 in the Office of the Recorder of Deeds in and for the County of Butler in Instrument No. 202104090010156, granted and conveyed unto 3200 Myers Street Partners, LLC, a California limited liability company.

*This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice, the Commitment to Issue Policy, the Commitment Conditions, Schedule A, Schedule B, Part I - Requirements, and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030000-A (4-12-17), 5030042-BI&BII(6-9-17) | Page 11 of 11 | ALTA Commitment for Title Insurance (8-1-16) Pennsylvania |
| --- | --- | --- |

EXHIBIT "2"

# EXHIBIT 3

# EXHIBIT 3



**CUSHMAN & WAKEFIELD**

**GRANT STREET ASSOCIATES, INC.**

INDUSTRIAL SALE OPPORTUNITY

# 64 HALSTEAD BOULEVARD

ZELIENOPLE, PA 16063 - BUTLER COUNTY



IDEAL OWNER/USER
**OPPORTUNITY**

## OFFERING FEATURES

- 93,400 SF Warehouse / Distribution / Light Manufacturing Building For Sale (3,400 SF of office space)
- Asking Price: $2,100,000 ($23/SF)
- New LED lighting
- Updated electrical panels
- Newly renovated office space
- Updated plumbing throughout
- New Reznor heaters in dock area
- Fully insulated, heated 5,000 sf section of warehouse with new garage doors and updated 3 phase electric panel.



**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

**CUSHMAN & WAKEFIELD |**
**GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
gsa-cw.com

Independently Owned and Operated  / A Member of the Cushman & Wakefield Alliance
The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associates (GSA) client and the property offered by GSA, is incidental only, and is not intended to convey any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property; and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if, as and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark owner. This is a non-existent or non-existing marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material originated from GSA.

EXHIBIT "3"





## INDUSTRIAL SALE OPPORTUNITY
# 64 HALSTEAD BOULEVARD
### ZELIENOPLE, PA 16063 - BUTLER COUNTY



## PROPERTY SUMMARY

| | |
|---|---|
| **ADDRESS** | 64 Halstead Blvd., Zelienople, PA 16063, Butler County |
| **PARCEL NUMBER** | 550-S2-BA33A |
| **ZONING** | Industrial |
| **BUILT/RENOVATED** | 1936 / 1990 / 2018 |
| **BUILDING AREA** | 93,400 SF Total<br>90,000 SF Warehouse<br>3,400 SF Office |
| **LOT SIZE** | 5.71 acres |
| **ROOF** | Metal |
| **HVAC** | Office |
| **UTILITIES** | All public |
| **CEILING HEIGHTS** | 16' to 20' |
| **DOCK DOORS** | 7 |
| **DRIVE-IN DOORS** | 7 |





**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

**CUSHMAN & WAKEFIELD |**
**GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
**gsa-cw.com**

Independently Owned and Operated / A Member of the Cushman & Wakefield Alliance

The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associates (GSA) client and the property offered by GSA, is incidental only, and is not intended to connote any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property; and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if, as and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark owner. Any marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material originated from GSA.

EXHIBIT "3"



# INDUSTRIAL SALE OPPORTUNITY

# 64 HALSTEAD BOULEVARD

## ZELIENOPLE, PA 16063 - BUTLER COUNTY





**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

**CUSHMAN & WAKEFIELD |
GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
gsa-cw.com

Independently Owned and Operated  / A Member of the Cushman & Wakefield Alliance

The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associate's (GSA) client and the property offered by GSA, is incidental only, and is not intended to convey any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property; and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if any, and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark owner. Any marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material originated from GSA.

EXHIBIT "3"




INDUSTRIAL SALE OPPORTUNITY

# 64 HALSTEAD BOULEVARD

ZELIENOPLE, PA 16063 - BUTLER COUNTY





**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

Independently Owned and Operated / A Member of the Cushman & Wakefield Alliance

**CUSHMAN & WAKEFIELD |
GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
**gsa-cw.com**

The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associate's (GSA) client and the property offered by GSA, is incidental only, and is not intended to convey any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if, as and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark holder. All marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material created from GSA.

EXHIBIT "3"





# INDUSTRIAL SALE OPPORTUNITY
# 64 HALSTEAD BOULEVARD
## ZELIENOPLE, PA 16063 - BUTLER COUNTY



LESS THAN 1 MILE TO THE RETAIL AMENITIES OF ZELIENOPLE

1.5 MILES TO I-79 SOUTHBOUND

ROUTE 19 / PERRY HIGHWAY

**5.71 ACRES**

2.2 MILES TO I-79 INTERCHANGE

**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

**CUSHMAN & WAKEFIELD |
GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
**gsa-cw.com**

Independently Owned and Operated  / A Member of the Cushman & Wakefield Alliance

The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associate's (GSA) client and the property offered by GSA, is incidental only, and is not intended to connote any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property, and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if, as and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark holder. All marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material originated from GSA.

EXHIBIT "3"

## CUSHMAN & WAKEFIELD
## GRANT STREET ASSOCIATES, INC.

INDUSTRIAL SALE OPPORTUNITY
# 64 HALSTEAD BOULEVARD
ZELIENOPLE, PA 16063 - BUTLER COUNTY

## BUTLER COUNTY INDUSTRIAL OVERVIEW

Butler County is one of the largest submarkets in the Pittsburgh MSA and includes 259 buildings and 16.4 million square feet (msf) of industrial inventory, half of which is warehouse/distribution product. The vacancy rate as of Q1 2021 sits at 7.5%, which has been flat quarter of quarter, and down markedly year over year. The market has been largely undisturbed by COVID pressures, as have much of the other industrial submarkets. The market has experienced positive net absorption figures for the past year, driven by access to major thoroughfares.





Market Rent Growth (YOY)

Rents across all industrial product types have edged up over the past year, up 3% since Q1 2020. This positive rent growth should continue, as demand for industrial product in Butler County continues and inventory remains flat. Industrial rents in Butler County are around $8.20/SF NNN, driven by logistics space asking rents that are above the Pittsburgh MSA average.

There are little supply side pressures currently, as only 2 smaller buildings are currently proposed, totaling 91,000 SF. Only 190,000 SF of industrial inventory has delivered over the past three years. Several noteworthy properties have traded over the last year, the most significant being 51 Pennwood Place in Warrendale which traded for $47,000,000 ($109/SF) and 263 W Kensinger Dr in Cranberry which traded for $15,000,000 ($131/SF).

**DANA SCHATZEL GRAU, CCIM**
Senior Vice President
(412) 391-2636
dgrau@gsa-cw.com
Lic. # RS200446L

**CUSHMAN & WAKEFIELD |
GRANT STREET ASSOCIATES, INC.**
310 Grant Street, Suite 1825, Pittsburgh, PA
412 391 2600
gsa-cw.com

Independently Owned and Operated  / A Member of the Cushman & Wakefield Alliance

The depiction in the included photograph of any person, entity, sign, logo or property, other than Grant Street Associates (GSA) client and the property offered by GSA, is incidental only, and is not intended to convey any affiliation, connection, association, sponsorship or approval by or between that which is incidentally depicted and GSA or its client. This listing shall not be deemed an offer to lease, sublease or sell such property, and, in the event of any transaction for such property, no commission shall be earned by or payable to any cooperating broker except if otherwise provided pursuant to the express terms, rates and conditions of GSA's agreement with its principal, if, as and when such commission (if any) is actually received from such principal. No warranty or representation, expressed or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any specific listing conditions, imposed by our principals. All photography is used with permission and licensed specifically for Grant Street Associates, Inc. All logo usage is only to identify the owner of the logo, and that the logo is not authorized by, sponsored by, or associated with the trademark owner. This is marketing material created by GSA will not be used or reproduced without our express permission or logo insignia notifying that said marketing material originated from GSA.

EXHIBIT "3"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER: 1. AUTHORIZING PRIVATE SALE OF REAL PROPERTY (64 HALSTEAD BLVD., ZELIENOPLE, PA 16063-1911) FREE AND CLEAR OF LIENS AND INTERESTS; 2. APPROVING OVERBID PROCEDURES IN CONNECTION WITH THE PROPOSED SALE; 3. APPROVING BREAKUP FEE; 4. CONFIRMING SALE TO THE THIRD PARTY PURCHASER; 5. DETERMINING THAT THE BUYER IS A GOOD FAITH PURCHASER; AND 6.  WAIVING THE FOURTEEN DAY STAY PRESCRIBED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h); DECLARATIONS OF ROBERT MOSIER, DANA GRAU AND SAMI SOUID (FOR BUYER) IN SUPPORT THEREOF.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On April 11, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒   Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) April 11, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐   Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) April 11, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

- The Honorable Scott Clarkson, USBC, 411 West Fourth Street, Santa Ana, CA 92701 (SUSPENDED DUE TO COVID-19 PROTOCOLS)

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 11, 2022 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| Date | Printed Name | Signature |

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

**Mailing Information for Case 8:22-bk-10057-SC**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Andrew S Bisom**    abisom@bisomlaw.com
- **Jeffrey W Broker**    jbroker@brokerlaw.biz
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Charity J Manee**    cmanee@goeforlaw.com, kmurphy@goeforlaw.com
- **Kevin H Morse**    kmorse@clarkhill.com, blambert@clarkhill.com
- **Raymond A Policar**    policarlaw@att.net
- **Thomas J Polis**    tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- **Nathan F Smith**    nathan@mclaw.org, CACD_ECF@mclaw.org;mcecfnotices@ecf.courtdrive.com;cvalenzuela@mclaw.org
- **Michael G Spector**    mgspector@aol.com, mgslawoffice@aol.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Larry D Webb**    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612